JESÚS CRUZ NEGRÓN, recurrido, *v.* ADMINISTRACIÓN DE CORREC-CIÓN, peticionaria.

*Número:* CC-2004-359 *Resuelto:* 28 de marzo de 2005

*Roberto J. Sánchez Ramos*, procurador general, abogado de la parte peticionaria; *Carlos Mondríguez Rivera*, abogado de la parte recurrida; *Waleska Casiano Matos*, abogado de la Administración de Corrección.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

El Sr. Jesús Cruz Negrón (el recurrido) extingue una pena de reclusión desde el 8 de octubre de 1987. A los veintitrés años de edad fue sentenciado a cumplir cuatro términos consecutivos de noventa y nueve años de reclusión por los delitos de asesinato en primer grado, tentativa de asesinato y dos violaciones a la Ley de Armas de Puerto Rico, 25 L.P.R.A. sec. 411 *et seq.* Fue sentenciado como delincuente habitual, debido a una convicción previa por incurrir en el delito de apropiación ilegal agravada y otra convicción por violación al Art. 406 de la Ley de Sustancias Controladas de Puerto Rico, 24 L.P.R.A. sec. 2406. Desde el 4 de noviembre de 1987, fue clasificado en un nivel de custodia máxima.

El 8 de enero de 2003, el recurrido presentó una petición de reclasificación del nivel de custodia ante el Comité de Clasificación y Tratamiento de la Administración de Corrección (Comité). El 28 de abril de 2003 el Comité reevaluó el nivel de custodia del recurrido y determinó que éste debía permanecer en un nivel de custodia máxima. En apoyo de tal decisión, expresó lo siguiente:

> Como medida de tratamiento. Por la naturaleza de los delitos de carácter extremo. Sentencia extremadamente alta. Poco tiempo cumplido con relación a la misma. Le falta más de 5 años para ser considerado por la Junta LBP. No obstante, to-

mamos en conocimiento que el confinado ha cumplido 16 años y 1 mes de su sentencia en custodia máxima. Entendemos que este tiempo no es comparativo con la sentencia impuesta por el Honorable Tribunal. Ha [sic] esto añadimos que el confinado fue declarado delincuente habitual y las sentencias impuestas para todos los delitos aparejan sentencias de 99 años consecutivas entre sí. Por lo que el confinado deberá permanecer observando ajuste por un tiempo adicional. Ubicación actual. Para que se beneficie de los programas disponibles y complete su 4to año.[1]

Inconforme, el recurrido apeló la decisión ante el Director de Clasificación, quien la sostuvo por razones similares. Determinó el Director que, aunque el recurrido ha realizado esfuerzos legítimos para beneficiarse de los servicios ofrecidos por la Institución, el tiempo cumplido en confinamiento debe ser proporcional a la sentencia impuesta. En consecuencia, estimó que el recurrido debía permanecer tiempo adicional en custodia máxima, continuar observando buenos ajustes y finalizar el cuarto año de escuela superior durante ese período.

De esa determinación, el recurrido acudió mediante recurso de *revisión* ante el Tribunal de Apelaciones (T.A.) el 24 de septiembre de 2003. Estimó dicho foro que el recurrido, tras dieciséis años clasificado en custodia máxima, observaba un excelente desempeño y que no había sido objeto de acciones disciplinarias, por lo que resulta arbitrario que, sin algún fundamento que no sea lo extenso de la sentencia, la Administración de Corrección determine que el recurrido deba permanecer observando ajustes por un tiempo adicional. Finalmente concluyó que los fundamentos expresados por el Comité no cumplen con los criterios establecidos en el manual de reglas adoptado en 1979.

El Procurador General recurrió ante nos de ese dictamen el 28 de abril de 2004 mediante un recurso de *certiorari*, en el cual planteó la comisión del error siguiente:

Erró el Tribunal de Apelaciones al abrogarse [sic] las funcio-

---

[1] Apéndice, págs. 10–11.

nes de la Administración de Corrección y así remover del nivel de custodia máxima a un confinado que ha sido sentenciado, como delincuente habitual, a cerca de cuatrocientos (400) años de prisión revisando *de novo* la determinación de la agencia.

Examinado el recurso, concedimos al recurrido un término de treinta días para que mostrara causa por la cual no debíamos revocar el dictamen del T.A. Éste cumplió oportunamente con lo ordenado en el Escrito en Cumplimiento de Orden.

Así las cosas, el 4 de octubre de 2004, el recurrido presentó una moción informativa y de desestimación, mediante la cual nos notificó que había sido reclasificado a un nivel de custodia de mediana seguridad y, por consiguiente, el caso se había convertido en académico. Examinado el escrito, concedimos al Procurador General un término de veinte días para que compareciera y mostrara causa por la cual no debíamos desestimar el recurso por académico. El 29 de noviembre de 2004, el Procurador General presentó su escrito en cumplimiento de dicha orden. Sostuvo que el caso de autos no debe ser desestimado, toda vez que presenta una excepción a la norma de academicidad por constituir una cuestión recurrente o susceptible de repetirse. El 20 de diciembre de 2004, el recurrido presentó un escrito en oposición al presentado por el Procurador General. Consideradas las posiciones de ambas partes, estamos listos para resolver.

## I

■ De entrada, debemos precisar que un asunto no es justiciable cuando: se trata de resolver una cuestión política; una de las partes no tiene capacidad jurídica para promover el pleito; después de comenzado el pleito, hechos posteriores lo convierten en académico; las partes buscan obtener una "opinión consultiva", o se promueve un pleito que no está maduro. *Noriega v. Hernández Colón*, 135 D.P.R. 406, 422–21 (1994).

■ En el caso normativo *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958), expresamos que un pleito será académico cuando su sentencia, por alguna razón, no tenga efectos prácticos. Abundando sobre el tema, en *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 724–725 (1980), resolvimos que el concepto "académico", en la litigación, "recoge la situación en que, aun cumplidos todos los requisitos de justiciabilidad, los cambios fácticos o judiciales acaecidos durante el trámite judicial de una controversia, tornan en académica o ficticia su solución". Al examinar la academicidad de un caso, debemos evaluar los eventos anteriores, próximos y futuros, para determinar si su condición de controversia viva y presente subsiste con el transcurso del tiempo. *Pres. del Senado*, 148 D.P.R. 737, 759 (1999). En *Asoc. de Periodistas v. González*, 127 D.P.R. 704, 719 (1991), citando al profesor Tribe, expusimos que

> [u]na vez se determina que un caso es académico los tribunales, por imperativo constitucional (ausencia de "caso o controversia") o por motivo de autolimitación judicial, deben abstenerse de considerarlo en sus méritos. Sin embargo, aun ante la presencia de un caso evidentemente académico, las complejidades de la doctrina nos llevan a preguntarnos si existe alguna razón que mueva al tribunal a considerar tal caso impregnado de academicidad.

■ Según esa normativa, se han elaborado una serie de excepciones que, de estar presente alguna de ellas, permiten que se considere un caso posiblemente académico, a saber:

> … cuando se plantea una cuestión recurrente; si la situación de hechos ha sido modificada por el demandado, pero no tiene características de permanencia; o donde aspectos de la controversia se tornan académicos, pero persisten importantes consecuencias colaterales. *Angueira v. J.L.B.P.*, 150 D.P.R. 10, 19 (2000). Véase *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988).

■ La excepción sobre el carácter recurrente o repetitivo de la controversia exige el estudio de tres factores:

la probabilidad de la recurrencia; las partes involucradas en el procedimiento, y la probabilidad de que la controversia evada la adjudicación o la revisión judicial. Cuando existe la probabilidad de que la controversia se repita o recurra, los tribunales deben considerar el asunto planteado a pesar de que se haya convertido en académico.

■ En cuanto a las partes en litigio, para que aplique la excepción del carácter recurrente no es necesario que al repetirse la controversia ésta afecte a las mismas partes. *Com. de la Mujer v. Srio. de Justicia*, supra.

■ Además del carácter recurrente o repetitivo del asunto planteado, y las partes en litigio, dicho asunto debe ser de naturaleza tal que evada su adjudicación o revisión. Esto sucede con mayor frecuencia en aquellas controversias que son, de por sí, de muy corta duración, aunque pueden existir otras que ocasionen que una controversia eluda la revisión judicial. *Asoc. de Periodistas v. González*, supra.

Así, al evaluar la procedencia de este recurso, debemos concentrar nuestro análisis en la relación existente entre los eventos que originaron el pleito y la adversidad presente. Bajo estas normas, no albergamos duda de que el caso de autos proyecta, por su singularidad, probabilidades sustanciales de recurrencia sobre controversias similares y, además, por la naturaleza del procedimiento de reclasificación de custodia puede ser susceptible de evadir la revisión judicial.[2] *Angueira v. J.L.B.P.*, supra.

---

[2] El Manual de Clasificación de Confinados, Reglamento Núm. 6067 de la Administración de Corrección de 22 de enero de 2000, establece una disposición especial para confinados encarcelados continuamente anterior al 1ro de mayo de 1996, mediante la cual se establece que la puntuación del instrumento de clasificación no redundará en un aumento del nivel de custodia de ningún confinado que haya estado encarcelado previo a esa fecha, a menos que la puntuación del confinado produzca un nivel mayor de custodia sólo como resultado de una o más violaciones disciplinarias o de uno o más delitos cometidos posterior a esa fecha. Aunque esta disposición aplica al caso ante nos, es inescapable el hecho de que el acusado, aun siendo reclasificado a un nivel de custodia mediana, debe recibir una revisión cada doce meses. Por esta razón, el asunto aquí planteado es susceptible de repetición.

Resuelto lo anterior, procedemos a atender el caso en sus méritos.

## II

En el caso de autos, el recurrido cuestionó ante el T.A. la determinación de la Administración de Corrección de mantenerle en un nivel de custodia máxima. Alegó que durante dieciséis años ha exhibido una buena conducta y que se ha beneficiado de los servicios de rehabilitación y trabajo que ofrece la institución carcelaria en la que cumple su condena. A su juicio, ello le merece ser reclasificado a un nivel de custodia mediana.

La controversia ante nos se ciñe a determinar si la buena conducta exhibida por un confinado y la participación de éste en programas de rehabilitación y trabajo son *los únicos factores* que la Administración de Corrección deberá tomar en cuenta al momento de determinar si procede un cambio en su nivel de custodia. Sin duda alguna, la respuesta a esta interrogante claramente debe ser en la negativa. Veamos.

La Constitución del Estado Libre Asociado de Puerto Rico determina que

> [s]erá política pública del Estado ... reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1999, pág. 421.

Para cumplir con dicho mandato, el Art. 5(a) y (c) de la Ley Orgánica de la Administración de Corrección, Ley Núm. 116 de 22 de julio de 1974 (4 L.P.R.A. sec. 1112(a) y (c)), faculta a dicha entidad a "[e]structurar la política pública en el área de corrección" y a "[f]ormular ... la reglamentación interna necesaria para los programas de diag-

nóstico, clasificación, tratamiento y rehabilitación de la clientela del sistema correccional".

De acuerdo con esta facultad estatuida, y a tenor con la política pública del Estado Libre Asociado de Puerto Rico, la Administración de Corrección adoptó el Manual de Reglas para Crear y Definir Funciones del Comité de Clasificación y Tratamiento de las Instituciones Penales, Reglamento Núm. 2485 de 27 de febrero de 1979 (Manual de Reglas de 1979), y el Manual de Clasificación de Confinados, Reglamento Núm. 6067 de 22 de enero de 2000. Ambos reglamentos limitan la discreción de la Administración de Corrección en todos los asuntos relacionados con la clasificación de custodia de un confinado.

La determinación administrativa relativa al nivel de custodia asignado a un confinado requiere que se realice un balance de intereses adecuado. Por una parte, estará el interés público de lograr la rehabilitación del confinado, así como mantener la seguridad institucional y general del resto de la población penal; de la otra, estará el interés particular del confinado de permanecer en un determinado nivel de custodia. Además, al momento de determinarse la procedencia de un cambio en el nivel de custodia, deberá considerarse una serie de factores subjetivos y objetivos, para cuya atención se requiere la pericia de la Administración de Corrección.

Entre los criterios subjetivos se destacan: (1) el carácter y la actitud del confinado; (2) la relación entre éste y los demás confinados y el resto del personal correccional; (3) el ajuste institucional mostrado por el confinado, entre otros. Por otro lado, entre los criterios objetivos que tomará la agencia para emitir su recomendación se encuentran: (1) la magnitud del delito cometido; (2) la sentencia impuesta; (3) el tiempo cumplido en confinamiento, entre otros. Véase la Regla 10 del Manual de Reglas de 1979, *supra.*

 Para documentar el proceso de reclasificación del nivel de custodia de un confinado, se les asigna una puntuación a los factores antes expresados. A base del resultado que se obtenga es que la Administración de Corrección recomienda un nivel de custodia que puede variar entre máxima, mediana, mínima o mínima comunitaria. En específico, entre los criterios objetivos que adopta el Manual de Clasificación de Confinados, *supra*, se encuentran: (1) la gravedad de los cargos y las condenas actuales; (2) el historial de delitos graves previos; (3) el historial de fuga; (4) el historial de acciones disciplinarias; (5) las condenas previas de delitos graves como adulto; (6) la edad del confinado, entre otros. Véase Sec. 7 del Manual de Clasificación de Confinados, *supra*. Si la suma de los primeros tres factores es mayor de siete, el confinado deberá ser asignado a un nivel de custodia máxima. En caso contrario, se entra a considerar los demás factores. Si el resultado obtenido resultara ser menor de cinco, y no existiese órdenes de arresto o detención contra el confinado, la escala recomienda un nivel de custodia menor. No obstante, la escala también provee varios renglones de *modificaciones discrecionales*, para aumentar o disminuir el nivel de custodia, entre los cuales se encuentra: la gravedad del delito, el historial de violencia excesiva, la afiliación prominente con gangas, que el confinado sea de difícil manejo, entre otras. Las instrucciones para completar el formulario de reclasificación de custodia establecen que en la categoría de "otras" se podrá incluir cualquier otro atributo relacionado con el confinado que justifique una modificación a un nivel de custodia más alto.

 En específico, la Regla 10 del Manual de Reglas de 1979, pág. 6, dispone expresamente que "[e]n toda evaluación de un caso en que se considere la asignación de tipo de custodia ... deberán tenerse presente [también] los delitos cometidos, las circunstancias de éstos, la extensión de la sentencia dictada, tiempo cumplido en confinamiento y

aquellos factores que garanticen la seguridad institucional y [de la sociedad en general]". En cuanto a este aspecto (la seguridad institucional), al evaluar conjuntamente la gama de criterios, los tribunales han determinado que el interés público en la rehabilitación de la población penal y en la seguridad institucional debe prevalecer sobre el interés particular del confinado en permanecer en un nivel de custodia en específico o en determinada institución penal.

Según el Manual, es al Comité de cada institución carcelaria a quien corresponde realizar la evaluación periódica correspondiente al nivel de custodia asignado a los confinados. En los casos en que el confinado se encuentre en un nivel de custodia máxima, la evaluación periódica se hará cada seis meses desde que se cumple con el primer año en tal clasificación. En el resto de los casos de custodia (intermedia, mínima, o mínima comunitaria), la evaluación se realizará cada doce meses. El propósito principal que persiguen estas evaluaciones periódicas es supervisar la adaptación del confinado y poder prestar una atención oportuna a cualquier situación pertinente que pudiera surgir. La Sec. 7(II) del Manual de Clasificación de Confinados, pág. 39, aclara que "[l]a reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o en la vivienda asignada". Es decir, este proceso de reevaluación es realizado por el Comité para atender las necesidades del confinado, observar su progreso y recomendar posibles cursos de acción en cuanto a su rehabilitación. Su reclasificación efectiva dependerá de otra serie de factores que han sido elaborados en los manuales y reglamentos antes discutidos, y los cuales tienen el efecto de limitar la discreción de la agencia al momento de adjudicar controversias relativas a la reclasificación de custodia de confinados.

Por lo general, la composición de estos comités la conforman peritos en el campo tales como técnicos sociope-

nales y oficiales o consejeros correccionales.([3]) Estos profesionales cuentan con la capacidad, la preparación, el conocimiento y la experiencia necesarios para atender las necesidades de los confinados y realizar este tipo de evaluaciones. Por esta razón, una determinación formulada por el referido Comité debe ser sostenida por el foro judicial siempre que no sea arbitraria o caprichosa y esté fundamentada en evidencia sustancial. Es decir, siempre que la decisión sea razonable, cumpla con el procedimiento establecido en las reglas y los manuales, y no altere los términos de la sentencia impuesta, el tribunal deberá confirmarla.([4])

Esta conclusión no es inusitada; está ampliamente avalada por nuestras leyes y jurisprudencia tanto en el ámbito local como federal. De acuerdo con la Sec. 4.5 de la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2175, según ha sido interpretado previamente por este Tribunal, la revisión judicial de una actuación administrativa debe limitarse a evaluar la razonabilidad de la decisión recurrida, la cual deberá ser sostenida a menos que se demuestre que es arbitraria o caprichosa. *Ramírez v. Depto. de Salud*, 147 D.P.R. 901 (1999); *Rivera v. A & C Development Corp.*, 144 D.P.R. 450 (1997); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1991); *A.R.P.E. v. J.A.C.L.*, 124 D.P.R. 858 (1989). Esta ponderada norma de deferencia a las determinaciones fácticas administrativas descansa en que las agencias, por razón de experiencia y conocimiento especializado, están en mejor posición para resolver las controversias surgidas en torno a los asuntos que le fueron encomendados por ley. *Íd.*

---

([3]) Si la decisión sobre la reclasificación de un confinado incluye un asunto relacionado con la salud, un representante institucional de salud correccional también deberá formar parte del Comité.

([4]) Del confinado no estar de acuerdo con la determinación del Comité, podrá cuestionarla ante el Director de Clasificación. De encontrarse aún inconforme, puede solicitar la revisión judicial ante el Tribunal de Apelaciones.

Cobra vital importancia esta norma en aquellos casos en que la agencia revisada es la Administración de Corrección, en asuntos sobre la calificación de los confinados para determinar el nivel de custodia de éstos.

Cónsono con lo anterior, tanto los tribunales federales como los estatales en Estados Unidos consistentemente han reconocido que las autoridades carcelarias poseen amplia discreción para adoptar e implementar las disposiciones reglamentarias necesarias para la consecución del interés del Estado en la rehabilitación de los confinados y en mantener la seguridad institucional y general. *Rhodes v. Chapman*, 452 U.S. 337 (1981); *Bell v. Wolfish*, 441 U.S. 540 (1979).

En *Bell v. Wolfish*, supra, págs. 547–548, el Tribunal Supremo de Estados Unidos expresó lo siguiente:

[T]he problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgement are needed to preserve internal order and discipline and to maintain institutional security. "Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters". We further observe that, on occasion, prison administrators may be "experts" only by Act of Congress or of a state legislature. But judicial deference is accorded not merely because the administrator ordinarily will, as a matter of fact in a particular case, have a better grasp of his domain than the reviewing judge, but also because the operation of our correctional facilities is peculiarly the province of the Legislative and Executive Branches of our Government, not the Judicial. (Escolios y citas omitidas.)

Esta doctrina fue reiterada en *Hewitt v. Helms*, 459 U.S. 469, 474 (1983), en el cual dicho foro sostuvo que:

In the volatile atmosphere of a prison, an inmate easily may constitute an unacceptable threat to the safety of the other

prisoners and guards even if himself has committed no conduct; rumor, reputation, and even more imponderable factors may suffice to spark potentially disastrous incidents. The judgment of prison officials in this context, like that of those making parole decisions, turns largely on "purely subjective evaluations and on predictions of future behavior."

Es en virtud de esta gran discreción que las autoridades correccionales deben gozar de gran deferencia por parte de los tribunales, cuando la parte alegadamente afectada pretende revisar judicialmente sus actuaciones.[5]

Es norma reiterada que los tribunales le deben dar gran peso o deferencia a las aplicaciones e interpretaciones de las agencias con respecto a las leyes y los reglamentos que administran, por lo que no pueden descartar libremente sus conclusiones e interpretaciones de derecho. *Asoc. Vec. H. San Jorge v. U. Med. Corp.*, 150 D.P.R. 70 (2000); *Rodríguez v. Méndez & Co.*, 147 D.P.R. 734 (1999); *Misión Ind. P.R. v. J.P.*, 146 D.P.R. 64 (1998); *Rivera v. A & C Development Corp.*, supra; *Com. Electoral P.I.P. v. C.E.E.*, 139 D.P.R. 48 (1995); *Rubín v. Trías*, 111 D.P.R. 481 (1982); *Román v. Superintendente de la Policía*, 93 D.P.R. 685 (1966). La interpretación administrativa no tiene que ser la única que razonablemente se pueda llegar del estatuto, siendo suficiente que esté sostenida por evidencia

---

[5] Cabe precisar que, aun cuando las instituciones correccionales disponen de tal discreción, los tribunales no abdican su responsabilidad constitucional para delinear y proteger los derechos fundamentales. Así, en *Sandin v. Conner*, 515 U.S. 472 (1995), el Tribunal Supremo de Estados Unidos, en ocasión de determinar si a un convicto le asiste un interés libertario bajo cierta reglamentación del sistema correccional de Hawaii, expresó:

"[We recognize that] States may under certain circumstances create liberty interests which are protected by the Due Process Clause. But these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (Citas omitidas.) Véanse, además: *Meachum v. Fano*, 427 U.S. 215 (1976); *Wolff v. McDonell*, 418 U.S. 539 (1974).

Es decir, en ausencia de circunstancias extraordinarias, en las cuales se someta al recluso a condiciones opresivas e inusitadas o se altere los términos de la sentencia, las instituciones carcelarias merecen deferencia en cuanto sus interpretaciones y conclusiones.

sustancial, que sea razonable y que sea compatible con el propósito legislativo. *Rodríguez v. Méndez & Co.*, supra. La razón principal detrás de la adopción de esta norma es la vasta experiencia y conocimiento (*expertise*) en relación con la materia que atienden día a día.

Conforme al marco jurídico antes expuesto, procede que resolvamos la presente controversia.

## III

Examinados los hechos del caso de autos, vemos que en 1987 el confinado fue condenado a cumplir cuatro términos consecutivos de noventa y nueve años de reclusión por los delitos de asesinato en primer grado, tentativa de asesinato y violación a los Arts. 5 y 8(A) de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418.

El T.A. expresó que la Administración de Corrección no tomó en cuenta el desempeño y la conducta del confinado en la institución carcelaria. Asimismo, determinó que la referida entidad no determinó nada referente a su historial social y delictivo, así como a su comportamiento durante los dieciséis años que ha estado recluido en la institución. Según el foro apelativo intermedio, lo que tomó en cuenta el Comité de Clasificación para denegar la reclasificación, como único y dominante criterio, fue la sentencia impuesta al confinado. Finalmente concluyó que los fundamentos expresados por el Comité de Clasificación no cumplen con los criterios del Manual de Reglas de 1979 ni con los índices ni el sistema de puntuación del Manual de Clasificación de Confinados. Ello, a su juicio, resultó ser una actuación arbitraria por parte de la Administración de Corrección. Erró el T.A. al resolver de esta manera.

Ciertamente, si la Administración de Corrección hubiese tomado en consideración para reclasificar al confinado únicamente lo extenso de su sentencia, ello hubiese

sido un claro abuso de discreción por parte de dicho cuerpo administrativo, pero éste no fue el caso. De un examen de las resoluciones emitidas tanto por el Comité como por el Director de Clasificación, vemos que ambos cuerpos consideraron otros factores, los cuales motivaron que se denegara la reclasificación del confinado a un nivel de custodia mediana.

Primeramente, de una lectura de los Acuerdos del Comité de Clasificación y Tratamiento en relación con el caso del confinado recurrido (los cuales contaron con la unanimidad de los tres miembros), vemos que, además de la sentencia impuesta, se tomaron como base para denegar la reclasificación los factores siguientes: (1) que el confinado fue declarado delincuente habitual, (2) la gravedad de los delitos cometidos, (3) la proporcionalidad entre el tiempo cumplido y el largo de la sentencia impuesta, y (4) que al confinado le faltaban ocho años para resultar elegible para la libertad bajo palabra. Como puede observarse, no sólo se tomó en cuenta la sentencia impuesta, sino otros criterios que los mismos reglamentos y manuales autorizaban a considerar.

Además de estos criterios, el Comité también consideró, conforme a la Regla 9(C)(1) del Manual de Reglas de 1979, la información que tenía del confinado a su disposición.

Sobre este último asunto, es menester llamar la atención sobre el riesgo que representa la decisión alcanzada por el foro apelativo intermedio, ya que no tomó en consideración las dos reevaluaciones previas de clasificación de custodia que se le habían realizado al confinado. De una lectura de la evaluación que se le hiciera al confinado el 23 de enero de 2002, podemos observar que le fue denegada la reclasificación de custodia, porque no cumplió con el plan institucional asignado, ya que se ausentaba del área escolar y porque tenía una querella pendiente por posesión de una jeringuilla. En dichos acuerdos, el Comité determinó

que el confinado necesitaba de controles de seguridad extras.[6] Además, el 11 de julio de 2002 y el 2 de diciembre de 2002, el confinado finalizó el tratamiento de Trastornos Adictivos y la terapia de grupo para personas adictas, respectivamente.

La siguiente evaluación que se le realizó en el 2003 es la que el confinado cuestionó ante el tribunal apelativo.[7] La actuación del Comité resulta compatible con el interés prioritario del Estado en preservar la seguridad institucional y en proteger a la sociedad de aquellas personas que han violado las normas formales de comportamiento. Es decir, dicho Comité —que, como mencionáramos anteriormente, está compuesto por dos técnicos sociopenales y por un oficial correccional— entendió como medida protectiva que el confinado debía permanecer un tiempo más en vigilancia. De esta manera, podían constatar con efectividad si la rehabilitación del confinado fue efectiva. En estas circunstancias, no debemos intervenir con la determinación de la agencia de no reclasificar al confinado.[8]

De otra parte, como medida para exhortar al confinado, tanto el Comité como el Director resaltaron los legítimos esfuerzos del confinado para beneficiarse de los servicios que la institución ofrecía y le indicaron que en lo que se le volvía a evaluar, debería finalizar el cuarto año de escuela superior y continuar observando buenos ajustes. Tanto la buena conducta exhibida por el confinado, así como su participación en distintos programas, fueron factores considerados por ambos cuerpos administrativos al reevaluarlo.

---

[6] Véase Apéndice del recurso, págs. 84–88.

[7] Véase Acuerdos del Comité de Clasificación y Tratamiento de 28 de abril de 2003, Apéndice del recurso, págs. 47–51.

[8] Debemos enfatizar lo que significa el hecho de que se transfiera al confinado a un nivel de custodia mediana. En ésta, el confinado estaría mayor tiempo fuera de su celda (a diferencia de la máxima en dónde puede estar fuera por sólo dos horas, y el resto del día en talleres y programas para su rehabilitación). Evidentemente, el confinado estaría compartiendo más tiempo con el resto de la población penal, lo que podría ser peligroso para él y para el resto de los confinados de no haberse rehabilitado completamente.

No obstante, al estudiar el contexto en el que se ha desarrollado el caso, estos dos factores aunque importantes no fueron los únicos que habrían de considerarse para transferir al confinado a un nivel de custodia mediano.

Por todas estas razones, *se revoca la sentencia del Tribunal de Apelaciones emitida el 17 de marzo de 2004 y se devuelve el caso a la Administración de Corrección.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri disintió por entender que el caso se tornó académico. La Juez Asociada Señora Fiol Matta concurrió con el resultado sin opinión escrita.