Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VIII

| JOSÉ A. PÉREZ RODRÍGUEZ<br><br>Recurrente<br><br>v.<br><br>DEPARTAMENTO DE CORRECCIÓN Y REHABILITACIÓN<br><br>Recurrido | KLRA202300570 | *REVISIÓN ADMINISTRATIVA* procedente del Departamento de Corrección y Rehabilitación<br><br>Núm. Caso: 7-97291<br><br>Sobre: RECLASIFICACIÓN DE CUSTODIA |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Rivera Colón, el Juez Monge Gómez y el Juez Cruz Hiraldo.

Cruz Hiraldo, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 17 de noviembre de 2023.

Comparece por derecho propio el Recurrente, el Sr. José Pérez Rodríguez, (en adelante, "Recurrente" o "Parte Recurrente"), para solicitarnos que se revise una *Resolución* emitida el 13 de octubre de 2023 por el Comité de Clasificación y Tratamiento de la Institución Máxima Seguridad Ponce (en adelante, "CCT") en la cual ratificó la custodia máxima del Recurrente.

Junto al recurso, el Recurrente acompañó una *Declaración en Apoyo de Solicitud para Litigar como Indigente (In Forma Pauperis)*, suscrita y juramentada por el Recurrente. En atención a su solicitud, eximimos al Recurrente de presentar el correspondiente arancel de presentación y se autoriza litigar *in forma papueris*.

Por los fundamentos que expondremos a continuación, se confirma la *Resolución* recurrida.

I

El Recurrente fue sentenciado el 9 de octubre de 1991 por múltiples delitos. Actualmente, se encuentra recluido en la Institución Máxima Seguridad Ponce (en adelante, "Institución")

cumpliendo una pena de reclusión de un total de trescientos veintinueve (329) años por delitos objeto de la sentencia y posterior a la misma.

El 13 de octubre de 2023, el CCT de la Institución evaluó la reclasificación de la custodia del Recurrente mediante el formulario *Escala de Reclasificación de Custodia (Casos Sentenciados)* provisto por la Institución. La puntuación obtenida de cuatro (4) en el formulario sugiere que se le otorgue el nivel de custodia mínima. No obstante, bajo las modificaciones discrecionales para asignar un nivel de custodia más alto, la Institución indicó que existe un historial de violencia excesiva y de desobediencia ante las normas, y que el Recurrente es de difícil manejo, por lo que recomendó el nivel de custodia máxima. Además, señaló que el Recurrente cumple una sentencia de trescientos veintinueve (329) años y trece (13) días por los delitos de asesinato en primer grado, asesinato en segundo grado, ambas de manera violenta que pusieron en riesgo la seguridad pública, y por delitos de fuga, donde se evadió estando bajo custodia máxima.

El CCT aprobó la recomendación y mantuvo la custodia máxima del Recurrente. Adicionalmente, el CCT emitió una *Resolución*, en la cual esbozó determinaciones de hechos del Recurrente y expuso sus conclusiones de derecho. En apretada síntesis, el CCT indicó que, aunque la escala de reclasificación de custodia arrojó una puntuación de cuatro (4), que sugiere custodia mínima, se utilizó una modificación discrecional para otorgar el nivel de custodia más alto por diversas razones. Entre ellas, el CCT tomó en consideración los delitos cometidos, particularmente los delitos contra la vida mediante utilización de armas de fuego y los cometidos posteriores a la sentencia, de la cual tres (3) son de fuga estando bajo custodia máxima, problemas en acatar las normas y el amplio historial disciplinario durante su confinamiento de veinte

años bajo custodia federal. El CCT concluyó que, a pesar de haber cumplido un poco más de treinta (30) años, de los cuales veinte fueron a nivel federal, la custodia máxima no lo ha impedido llevar a cabo su comportamiento delictivo y procedió a ratificar su custodia máxima.

Inconforme, el 18 de octubre de 2023, el Recurrente presentó un *Recurso de Revisión* ante este foro revisor con el siguiente señalamiento de error:

> ERR[Ó] LA ADMINISTRACIÓN DE CORRECCIÓN EN VIOLACIÓN AL MANDATO CONSTITUCIONAL DE LA REHABILITACIÓN MORAL Y SOCIAL AL NO REDUCIR LA CUSTODIA DEL RECURRENTE AMPAR[Á]NDOSE EN UNA MODIFICACIÓN DISCRECIONAL QUE NO LE APLICA.

Luego de evaluar el escrito de la parte recurrente, así como la evidencia documental anejada al mismo, prescindimos de la comparecencia de la parte recurrida, según nos faculta la Regla 7(B)(5) del Reglamento del Tribunal de Apelaciones[1], en aras de lograr su más justo y eficiente despacho, sin trámite ulterior. Por tanto, procedemos exponer el derecho aplicable.

II

**A. *Deferencia Administrativa***

El objetivo principal de la revisión judicial se enfoca en garantizar que las agencias administrativas actúen conforme a las facultades concedidas por ley.[2] Constituye una norma reiterada por el Tribunal Supremo de Puerto Rico que los tribunales apelativos deben conceder deferencia a las determinaciones de las agencias administrativas por la experiencia y conocimiento especializado que éstas poseen sobre los asuntos ante su consideración y que por ley

---

[1] Regla 7(B)(5) del Reglamento del Tribunal de Apelaciones, 4 LPRA Ap. XXII-B, R. 7(B)(5).
[2] *Hernández Feliciano v. Mun. de Quebradillas*, 2023 TSPR 6; *Oficina de Ética Gubernamental v. Martínez Giraud, 209 DPR 79, 88 (2022)*.

se les ha delegado.[3] Por ello, las determinaciones de las agencias administrativas gozan de una presunción de legalidad y corrección que los tribunales deben respetar mientras que no se presente evidencia suficiente para superarla o invalidarla.[4]

La parte que impugna judicialmente una determinación de hecho de una agencia administrativa tiene el peso de la prueba para demostrar que estas no están basadas en el expediente o que las conclusiones a las que llegó son irrazonables.[5] Conforme a lo dispuesto en la Sección 4.5 de la LPAU[6], las determinaciones de hechos de una agencia del Gobierno "se sostendrán si se fundamentan en evidencia sustancial que obre en el expediente administrativo."[7] A estos fines, el Tribunal Supremo ha establecido que la evidencia sustancial es "aquella prueba relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión".[8] Empero, la aceptación no puede estar sostenida por un ligero destello de evidencia o por simples inferencias.[9]

Ahora bien, el criterio rector al momento de pasar juicio sobre la decisión de un foro administrativo es la razonabilidad de la actuación de la agencia, luego de considerar el expediente administrativo en su totalidad.[10] Consecuentemente, la revisión judicial estará limitada a evaluar si la actuación de la agencia fue arbitraria, ilegal o irrazonable, constituyendo así un abuso de discreción.[11] De este modo, el alcance del proceso de revisión se ciñe a determinar: 1) si el remedio concedido por la agencia fue el

---

[3] *Hernández Feliciano v. Mun. de Quebradillas, supra*; *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 89; *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 35 (2018); *Torres Rivera v. Policía de PR,* 196 DPR 606, 626 (2016).

[4] *Capó Cruz v. Junta Planificación et al.*, 204 DPR 581, 591 (2020).

[5] *González Segarra et al. v. CFSE*, 188 DPR 252, 276–278 (2013); *OCS v. Universal*, 187 DPR 164, 178–179 (2012).

[6] 3 LPRA sec. 2175.

[7] *JP, Plaza Santa Isabel v. Cordero Badillo,* 177 DPR 177, 187 (2009).

[8] *Capó Cruz v. Junta Planificación et al.*, *supra*, citando a *Rebollo v. Yiyi Motors*, 161 DPR 69, 77 (2004).

[9] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 90.

[10] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 89; *Torres Rivera v. Policía de PR, supra*, pág. 627; *Otero v. Toyota*, 163 DPR 716, 727 (2005).

[11] *Torres Rivera v. Policía de PR, supra*, pág. 626.

apropiado; 2) si las determinaciones de hecho de la agencia están basadas en evidencia sustancial que obra en el expediente administrativo, y; 3) si las conclusiones de derecho fueron las correctas.[12]

Por su parte, las determinaciones de derecho pueden ser revisadas en todos sus aspectos.[13] No obstante, la revisión judicial no equivale a la sustitución automática del criterio e interpretación del organismo administrativo.[14] Los tribunales revisores descartarán el criterio de los entes administrativos cuando no se pueda hallar fundamento racional que explique o justifique el dictamen administrativo.[15] En virtud de ello, los tribunales revisores descartarán el criterio de la agencia administrativa, en el cual cederá la deferencia administrativa, sólo cuando la agencia: 1) erró al aplicar la ley; 2) actuó arbitraria, irrazonable o ilegalmente, o; 3) lesionó derechos constitucionales fundamentales.[16]

Además, el criterio administrativo no podrá prevalecer cuando la interpretación estatutaria realizada por una agencia provoque un resultado incompatible o contrario al propósito para el cual se aprobó la legislación y la política pública que la promueve.[17] En ese sentido, la deferencia judicial al "*expertise*" administrativo, concedido cuando las agencias interpretan la ley, tiene que ceder ante actuaciones que resulten irrazonables, ilegales o que conduzcan a la comisión de una injusticia.[18] Por ende, los tribunales tienen que armonizar, siempre que sea posible, todos los estatutos y reglamentos administrativos involucrados para la solución justa

---

[12] *Id.*, pág. 627.
[13] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, pág. 90; *Capó Cruz v. Junta Planificación et al., supra.*
[14] *Capó Cruz v. Junta Planificación et al., supra.*
[15] *Id.*; *Rolón Martínez v. Supte. Policía, supra*, pág. 36.
[16] *Id.*; *JP, Plaza Santa Isabel v. Cordero Badillo, supra.*
[17] *Oficina de Ética Gubernamental v. Martínez Giraud, supra*, págs. 90-91.
[18] *Moreno Lorenzo v. Dept. de la Familia*, 207 DPR 833, 843 (2021).

de la controversia, de modo que se obtenga un resultado sensato, lógico y razonable.[19]

Cabe destacar que, en el ejercicio de la función revisora de los tribunales apelativos, los foros apelativos deben diferenciar entre asuntos de interpretación estatutaria, del cual los tribunales son especialistas, y los asuntos propios de la discreción o la pericia administrativa.[20] En lo pertinente, el Tribunal Supremo ha reconocido que la reclasificación de los niveles de custodia de los confinados es un acto discrecional de las autoridades correccionales realizadas por peritos en la materia, por lo que estas determinaciones gozan de gran deferencia por parte de los tribunales.[21] Por tanto, una determinación formulada por el CCT debe ser sostenida por el foro judicial, siempre que la misma no sea arbitraria o caprichosa y está fundamentada en evidencia sustancial.[22]

## B. *La Reclasificación de Custodia*

La Sección 19 del Artículo VI de la Constitución del Estado libre Asociado de Puerto Rico[23] y la Ley Núm. 2-2011[24], según enmendada, establece como política pública, siguiendo los principios de tratamiento individualizado, que el sistema correccional propiciará la rehabilitación moral y social de las personas en confinamiento. A estos efectos, el Departamento de Corrección y Rehabilitación (DCR) aprobó el Reglamento Núm. 9151, titulado *Manual para la Clasificación de los Confinados* (en adelante, "Reglamento"), con el propósito de "establecer un sistema

---

[19] *Id.*

[20] *Hernández Feliciano v. Mun. de Quebradillas*, 2023 TSPR 6; *OCS v. Point Guard Ins.*, 205 DPR 1005, 1028 (2020).

[21] *Cruz v. Administración*, 164 DPR 341, 357 (2005).

[22] *Id.*, pág. 355.

[23] Art. VI, Sec. 19, Const. ELA [Const. PR], LPRA Tomo 1.

[24] Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, Ley Núm. 2-2011, 3 LPRA, Ap. XVIII, et seq.

organizado para ingresar, procesar y asignar los confinados a instituciones y programas de adultos" del DCR.[25]

Según dispone el Reglamento, "la clasificación de los confinados consiste en la separación sistemática y evolutiva de los confinados en subgrupos, en virtud de las necesidades de cada individuo, las exigencias y necesidades de la sociedad".[26] Además, "el proceso de clasificación coordina la custodia física de los confinados con los programas y recursos disponibles dentro del Sistema Correccional".[27] Asimismo, el sistema buscar ubicar a cada confinado en el programa y nivel de custodia menos restrictivo posible del cual cualifique, sin menoscabo a la seguridad y necesidades de la sociedad, de los demás confinados y del personal correccional.[28]

En respecto al nivel de custodia de un confinado, esta determinación administrativa requiere que se realice un balance de intereses adecuado entre el interés público de rehabilitar al confinado y mantener la seguridad institucional y general de la población penal y el interés particular del confinado permanecer en un determinado nivel de custodia.[29] A estos efectos, cuando ha de determinarse la procedencia de una reclasificación en el nivel de custodia, deberá considerarse una serie de factores subjetivos y objetivos, cuyo ejercicio requiere la pericia de la Administración de Corrección.[30]

El Comité de Clasificación y Tratamiento (CCT) tiene la función de evaluar a los confinados en lo que respecta a sus necesidades, aptitudes, limitaciones y funcionamiento social para

---

[25] Manual para la Clasificación de los Confinados, Reglamento Núm. 9151, Departamento de Estado, 22 de enero de 2020, pág. 2.
[26] *Id.*, pág. 1.
[27] *Id.*
[28] *Id.*
[29] *Cruz v. Administración, supra*, pág. 352.
[30] *Id.*

determinar cuál será el plan institucional de cada confinado.[31] Adicionalmente, el CCT posee la facultad de referir confinados a la Junta de Libertad bajo Palabra y recomendar confinados a programas y áreas de servicios, pases con o sin escolta.[32] Este cuerpo revisará los niveles de custodia para confinados de custodia mínima y mediana cada doce (12) meses y para los confinados de custodia máxima, una vez hayan cumplido su primer año de sentencia bajo custodia máxima, cada seis (6) meses.[33] No obstante, los confinados con sentencia de noventa y nueve (99) años o más y clasificados inicialmente en custodia máximo a causa de dicha sentencia, deberán permanecer en dicha custodia por cinco (5) años, incluyendo el tiempo cumplido en preventiva, antes de ser evaluados.[34]

El Reglamento reconoce cuatro (4) niveles de custodia de la cual se basan en el grado de supervisión requerido del confinado. Los distintos niveles de custodia se definen de la siguiente forma:

> **MÁXIMA** – Confinados de la población general que requieren un grado alto de control y supervisión. A estos individuos se les puede restringir de determinadas asignaciones de trabajo y de celda, así como de determinadas áreas dentro de la institución, según se estime necesario por razones de seguridad. Se requerirán por lo menos dos oficiales correccionales como escolta para realizar viajes de rutina o de emergencia fuera de la Institución. Se utilizarán esposas, cadenas y grilletes en todo momento mientras los confinados de custodia máxima se encuentren fuera el perímetro de seguridad (la verja o el muro). Estos confinados estarán en celdas y no en dormitorios. Esto no limita la participación del confinado en los programas y servicios. Contarán con un período mínimo de dos (2) horas diarias de recreación física al aire libre, según lo permitan las condiciones climáticas.

> **MEDIANA** – Confinados de la población general que requieren un grado intermedio de supervisión. Estos confinados son asignados a celdas o dormitorios y son elegibles para ser asignados a cualquier labor o actividad que requiera supervisión de rutina dentro del perímetro de seguridad de la institución. Se requiere de dos oficiales correccionales como escolta para realizar

---

[31] Manual para la Clasificación de los Confinados, *supra*, pág. 19.
[32] *Id.*, págs. 19-20.
[33] *Id.*, págs. 23-24.
[34] *Id.*, pág. 24.

viajes, ya sean de rutina o de emergencia, fuera de la institución, y se utilizarán esposas con cadenas en todo momento. A discreción de los oficiales de escolta, se podrán utilizar otros implementos de restricción.

**MÍNIMA** – Confinados de la población general que son elegibles para habitar en viviendas de menor seguridad y que pueden trabajar fuera del perímetro con un mínimo de supervisión. Estos confinados son elegibles para los programas de trabajo y actividades en la comunidad compatibles con los requisitos normativos. Estos individuos pueden hacer viajes de rutina o de emergencia fuera de la Institución sin escolta, cuando tengan un pase autorizado, y pueden ser escoltados sin implementos de restricción.

**MÍNIMA/COMUNIDAD** – Confinados de la población general que están en custodia mínima, pero que han sido catalogados según las políticas del DCR como elegibles para programas comunitarios. Por lo general, estos son programas residenciales sin perímetro de seguridad alguno.[35]

La Sección 7 del Reglamento regula los procedimientos de reclasificación de niveles de custodia para actualizar y revisar la evaluación inicial de custodia del confinado.[36] El Reglamento resalta la importancia de que los confinados que cumplan sentencias prolongadas tengan la oportunidad de obtener una reducción en niveles de custodia mediante el cumplimiento con los requisitos de la institución.[37] Ahora bien, el Reglamento señala que "[l]a reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada", pues, el objetivo es verificar la adaptación del confinado y prestarle atención a cualquier situación que pueda surgir.[38] Dicha reevaluación de custodia, aunque parecida a la evaluación inicial, gira más en torno a la conducta institucional como reflejo del comportamiento real del confinado durante su reclusión.[39] A estos efectos, nuestro Tribunal Supremo ha expresado que "[n]o sólo se le da más peso a la conducta que ha observado el recluso durante el

---

[35] *Id.*, págs. 9-10.
[36] *Id.*, pág. 48.
[37] *Id.*
[38] *Id.*
[39] *Id.*

confinamiento, sino que, incluso, no se considera la mala conducta dentro de la prisión que se haya dado mucho tiempo atrás, como son los motines y las fugas en periodos remotos".[40]

Las reclasificaciones de custodia se llevan a cabo mediante el *Formulario de Reclasificación de Custodia/Escala de Reclasificación de Custodia (Casos Sentenciados)* (en adelante, "Formulario").[41] Dicho Formulario conlleva una escala de evaluación para determinar el nivel de custodia en el que se ubicará al confinado. Esta contiene criterios objetivos a considerar del cual se asignará una ponderación numérica fija. A cada criterio se le asignará una puntuación que se sumará o restará, según corresponda al historial del confinado. Los factores a considerarse son los siguientes: (1) gravedad de los cargos/sentencias actuales; (2) historial de delitos graves anteriores; (3) historial de fuga, excluyendo cargos actuales; (4) número de acciones disciplinarias; (5) la acción disciplinaria más seria; (6) sentencias anteriores por delitos graves como adulto en los últimos 5 años; (7) la participación en programas; y (8) la edad actual del confinado.[42]

Acumulado la puntación, el nivel de custodia que se asignará para los casos sentenciados, según la escala, es el siguiente:

| | | |
|---|---|---|
| Mínima | = | 5 puntos o menos |
| Mediana | = | 5 puntos o menos si el confinado tiene una orden de detención, de arresto, u orden de   detención por violar la libertad bajo palabra o probatoria. |
| Mediana | = | 6-10 puntos en los renglones 1-8 |
| Máxima | = | 7 puntos o más en los renglones 1-3 |
| Máxima | = | 11 puntos o más en los renglones 1-8[43] |

---

[40] *López Borges v. Adm. Corrección*, 185 DPR 603, 609 (2012)
[41] Manual para la Clasificación de los Confinados, *supra*; véase Apéndice K del Manual para la Clasificación de los Confinados, *supra*.
[42] Véase Apéndice K del Manual para la Clasificación de los Confinados, *supra*, págs. 3-5.
[43] *Id.*, pág. 6.

No obstante, la puntuación obtenida en esta etapa objetiva no obliga al Comité a recomendar el nivel de custodia establecido en la escala debido a que existen modificaciones discrecionales que pudieran resultar en un aumento o disminución del nivel de custodia sugerido. En lo pertinente al caso que nos ocupa, los criterios para las modificaciones discrecionales adicionales para recomendar un nivel de custodia más alto son los siguientes: (1) gravedad del delito; (2) **historial de violencia excesiva**; (3) afiliación prominente con gangas; (4) **si el confinado constituye un problema de manejo**; (5) grados de reincidencia; (6) riesgo de fuga; (7) comportamiento sexual agresivo; (8) trastornos mentales o desajustes emocionales; (9) si representa una amenaza o peligro; (10) **desobediencia ante las normas o rehusarse al plan de tratamiento**; y (11) el reingreso por violación de normas.[44]

El Reglamento dispone que "toda modificación discrecional debe estar basada en documentación escrita, proveniente de reportes disciplinarios, informes de querellas, informes de libros de novedades, documentos del expediente criminal o social y cualquier otra información o documento que evidenci[e] ajustes o comportamiento del confinado contrario a las normas y seguridad institucional".[45] Por otro lado, el Reglamento señala que "[n]o se podrá recurrir al uso de la Modificación Discrecional sobre la "Gravedad del delito" ni al uso de los fundamentos "extensión o largo de la sentencia" para mantenerlos en custodia máxima".[46] Esto es así porque de solo evaluar la conducta por la está recluida la persona o si se le diera mayor importancia a las características de su sentencia, la reevaluación periódica perdería sentido, pues el resultado del análisis sería el mismo.[47] Por tanto, al momento de

---

[44] *Id.*, págs. 8-11.
[45] *Id.*, pág. 8.
[46] Manual para la Clasificación de los Confinados, *supra*, pág. 24.
[47] *López Borges v. Adm. Corrección, supra*, págs. 609-610.

reclasificar al confinado, tomar en consideración solamente lo extenso de la sentencia constituye un abuso de discreción.[48]

En lo pertinente, con motivo de desmenuzar los criterios de modificación discrecional, el Reglamento define "**historial de violencia excesiva**" de la siguiente manera:

> El confinado tiene un historial documentado de conducta violenta, como, por ejemplo, asesinato, violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación del historial de violencia. Esta conducta puede haber ocurrido hace más de cinco años mientras el confinado estuvo encarcelado o mientras estaba asignado a un programa comunitario.

> Se refiere a clientes cuyo historial de funcionamiento social o delictivo revele agresividad o que constantemente sus acciones manifiesten conducta violenta. Esta podría demostrarse a través de ataques físicos o tentativa de ataques a otros clientes, a oficiales de custodia, a empleados o a cualquier otra persona, acompañados estos en ocasiones por el uso de armas, vocabulario provocador a insultante o destrucción de la propiedad.[49]

En adición, el Reglamento establece que el criterio de que el "**confinado constituye un problema de manejo**" significa lo siguiente:

> El confinado tiene un historial documentado de problemas de manejo durante su encarcelamiento, y/o de conducta desordenada en la comunidad. Este historial puede incluir: incitar, provoca o agitar a sus compañeros; interrumpir las operaciones de la institución; o demostrar hostilidad o reto hacia la autoridad.[50]

Por último, el reglamento establece que la "**desobediencia ante las normas o rehusarse al plan de tratamiento**" significa que "[e]l confinado presenta una marcada tendencia a desobedecer las normas y reglas de la institución".[51] Establecida la puntación y considerado las modificaciones discrecionales, si alguna, el CCT determinará si el confinado es acreedor de reclasificación de

---

[48] *Id.*, pág. 611; *Cruz v. Administración, supra*, pág. 359.
[49] Véase Apéndice K del Manual para la Clasificación de los Confinados, *supra*, págs. 8.
[50] *Id.*, pág. 9.
[51] *Id.*, pág. 10.

custodia o si se mantiene el actual nivel de custodia. Como destacamos anteriormente, la reclasificación de los niveles de custodia de los confinados es un acto de gran discreción por peritos en el campo, por lo que estas determinaciones gozan de gran deferencia por parte de los tribunales.[52] Por ende, la determinación del CCT debe ser sostenida por el foro judicial, siempre que la misma no sea arbitraria o caprichosa y está fundamentada en evidencia sustancial.[53]

### III

La controversia ante se ciñe a determinar si el CCT cometió el error de ratificar la custodia máxima del Recurrente al basarse en una modificación discrecional. El Recurrente argumentó que el CCT incidió en no reclasificar su custodia máxima por ampararse en la modificación discrecional. Arguyó que la modificación discrecional que se utilizó se amparó únicamente en el largo de la pena de su sentencia y en querellas de "muchos años de antigüedad", pues su última querella fue hace tres (3) años. No le asiste la razón. Veamos.

El Recurrente obtuvo una puntuación de cuatro (4) en el formulario de reclasificación. Según la escala del formulario, el Recurrente debió ser reclasificado al nivel de custodia mínima. Sin embargo, se utilizó las modificaciones discrecionales para recomendar un nivel de custodia más alto y, basándose en ello, el CCT ratificó la custodia máxima del Recurrente. Según constamos del expediente, se utilizaron tres (3) criterios de modificación discrecional, lo cual fueron el historial de violencia excesiva, dificultad de manejo del Recurrente y desobediencia ante las normas. Recordamos que la puntuación obtenida en los renglones objetivos de la escala no obliga al CCT a reclasificar al confinado y éste tiene la facultad de utilizar las modificaciones discrecionales,

---

[52] *Cruz v. Administración, supra,* pág. 357.
[53] *Id.*, pág. 355.

siempre y cuando no se base exclusivamente en las características de la sentencia por la que se encuentra recluido, lo cual no ocurrió en el caso de epígrafe.

El CCT destacó que el Recurrente cumple sentencias por delitos contra la vida y seguridad de seres humanos, particularmente servidores públicos. Según la *Resolución* del CCT, el Recurrente cumple una sentencia de un largo historial de violencia excesiva compuesta de, pero no limitada a, asesinato en primer grado, asesinato en segundo grado, agresión agravada y diversidad de infracciones a la Ley de Armas, de los cuales la mayoría fueron cometidos posteriores a la sentencia por la cual fue recluido. Asimismo, el CCT resalta que el Recurrente ha cometido una multiplicidad de delitos durante su reclusión, específicamente tres (3) fugas, entre ellas una fuga en helicóptero estando en custodia máxima. Además, durante su tiempo bajo custodia federal, que ocurrió desde el año 2002 al 2023, el Recurrente incurrió en veintiséis (26) querellas disciplinarias, incluyendo por posesión de armas peligrosas, agresión, incendios, desobediencias de órdenes, interferencias con los procesos, introducción de sustancias controladas, rehusarse a trabajar, entre otros. La última querella fue el 4 de noviembre de 2020.

Finalmente, el CCT concluyó que el Recurrente, a pesar de encontrarse en custodia máxima, ha llevado a cabo un comportamiento delictivo continuo y que se observará su conducta por un tiempo prolongado en lo que se estructura el plan institucional del Recurrente. El CCT no amparó su determinación únicamente en las características de la sentencia, según alegó el Recurrente. Evidentemente, el CCT consideró y brindó gran peso a la conducta del Recurrente durante su confinamiento al esta ser compuesta de un largo historial de violencia excesiva, difícil manejo y desobediencias ante las normas de la administración correccional.

Las infracciones, sean querellas o delitos cometidos, han sido continuas y no eventos aislados o remotos que ameriten menor consideración. El Recurrente ha llevado un patrón de conducta que compromete la seguridad institucional y general de la población penal y no muestra que el Recurrente haya progresado en su rehabilitación.

En conclusión, resulta forzoso concluir que existe una ausencia de abuso de discreción que no nos encontramos ante un determinación caprichosa ni arbitraria. La determinación del CCT está fundamentada en evidencia sustancial, por lo que no amerita intervención por este Tribunal de Apelaciones. Por tanto, le acreditamos entera deferencia al CCT en su determinación.

IV

Por los fundamentos antes expresados, los cuales hacemos formar parte de este dictamen, se confirma la *Resolución* recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones