EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Luis E. Lebrón Laureano<br><br>Recurrido<br><br>v.<br><br>Departamento de Corrección y Rehabilitación<br><br>Peticionario | Certiorari<br><br><br>2022 TSPR 68<br><br>209 DPR \_\_\_\_ |

Número del Caso: CC-2020-641


Fecha: 27 de mayo de 2022


Oficina del Procurador General:

     Lcdo. Isaías Sánchez Báez
     Procurador General

     Lcdo. Pedro A. Vázquez Montijo
     Subprocurador General

     Lcda. Sylvia Roger Stefani
     Procuradora General Auxiliar


Abogado de la parte recurrida:

     Por derecho propio


Materia: Derecho Administrativo: Criterio de "historial de violencia excesiva" de la Escala de Reclasificación de Custodia para confinados sentenciados.


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis E. Lebrón Laureano

     Recurrido

      v.                    CC-2020-0641

Departamento de Corrección
y Rehabilitación

     Peticionario

Opinión del Tribunal emitida por el Juez Asociado señor Martínez Torres

En San Juan, Puerto Rico, a 27 de mayo de 2022.

Debemos interpretar los contornos del criterio discrecional de "historial de violencia excesiva" de la Escala de Reclasificación de Custodia para confinados sentenciados, y si este se circunscribe únicamente a la conducta del confinado durante su confinamiento. De resolver en la negativa, debemos determinar, además, si este fue el único factor subjetivo que se utilizó para ratificar la custodia máxima del recurrido. Respondemos ambas interrogantes en la negativa.

I

El Sr. Luis Lebrón Laureano cumple una sentencia de 233 años por dos cargos de asesinato en primer

grado y Ley de Armas. Este cumplirá el mínimo de su sentencia el 13 de octubre de 2090 y el máximo, tentativamente, el 13 de junio de 2236. Los hechos que dieron paso a su procesamiento y posterior convicción ocurrieron el 8 de mayo de 2011. El señor Lebrón Laureano, mediante el uso de armas largas automáticas o semiautomáticas y recortadas, acudió a la Barriada Figueroa en Santurce y disparó al público. Como parte de este incidente murieron dos personas y otra resultó herida.

En lo que respecta a esta controversia, el 21 de noviembre de 2019 el Comité de Clasificación y Tratamiento (Comité) se reunió para evaluar el nivel de custodia del señor Lebrón Laureano. El Comité ratificó el nivel de custodia máxima del recurrido. Ese mismo día el Comité emitió una resolución con determinaciones de hechos y conclusiones de derecho para apoyar su decisión. Surge de la Escala de Reclasificación de Custodia (Escala de Reclasificación) que utilizó el Comité en su evaluación, que el Departamento de Corrección y Rehabilitación (Departamento de Corrección) le aplicó al señor Lebrón Laureano una puntuación de seis en el renglón de gravedad de los cargos/sentencias actuales. Sin embargo, se le restó un punto en el renglón que atiende la edad actual del confinado. Así, la puntuación de la Escala de Reclasificación arrojó cinco puntos, que corresponde a custodia mínima. No obstante, en el ejercicio de evaluación, el Comité empleó la "modificación discrecional" de "historial de violencia excesiva" para un nivel de custodia

más alto. Conforme a esta se recomendó un nivel de custodia máxima. Además, en las determinaciones de hechos el Comité indicó que el señor Lebrón Laureano cuenta con antecedentes penales por infracción al delito de tentativa de asesinato. Por otro lado, indicó que el 29 de enero de 2014 fue encontrado incurso en una Querella Nivel I (Código 109 Posesión de teléfono celular), por la cual fue sancionado con la suspensión de visitas por dos meses.

Inconforme, el señor Lebrón Laureano presentó una apelación administrativa. En síntesis, argumentó una crasa falta de objetividad y que su expediente no fue evaluado. Arguyó que durante el tiempo que prestó labores en la cocina recibió evaluaciones excelentes en ajuste y progreso. En cuanto a los delitos previos, arguyó que ya cumplió su sentencia. Asimismo, enfatizó que la querella de disciplina era del 2014 y que en aquel momento se penalizó. Además, destacó que el Manual para Crear y Definir Funciones del Comité de Clasificación y Tratamiento en las Instituciones Correccionales, infra, quedó enmendado por el Reglamento Núm. 9033, infra. Indica que, a través de esta enmienda, los reclusos con sentencias de 99 años o más, clasificados en el nivel de custodia máxima, permanecerían cinco años en esta y que no se puede recurrir al uso de la modificación discrecional de "gravedad del delito" ni a los fundamentos de "extensión o largo de la sentencia" para mantenerlos en custodia máxima.

El Departamento de Corrección denegó la apelación. Resolvió que los delitos que cometió el señor Lebrón Laureano evidenciaron gran menosprecio por la vida de dos personas y que su historial delictivo demuestra que no aprendió tras resultar convicto de tentativa de asesinato. Ap. Sol. Cert., pág. 91. Además, advirtió que el Comité no utilizó el criterio de "gravedad del delito" ni los fundamentos de "extensión o largo de la sentencia" para ratificar la custodia en un nivel de máxima. Insatisfecho, el señor Lebrón Laureano instó una petición de reconsideración que también se denegó.

Agotados los remedios administrativos, el confinado acudió al Tribunal de Apelaciones. Ese foro revocó la decisión del organismo administrativo. Estableció que surgía del expediente que el señor Lebrón Laureano no se benefició de terapias porque, aunque las solicitó, no estaban disponibles. Además, sostuvo que la querella aludida no era reciente, sino remota y no debía considerarse. El foro intermedio determinó que el Comité obvió la letra del <u>Manual para la clasificación de confinados</u>, <u>infra</u>, al ignorar que la reevaluación de custodia debe limitarse a la conducta institucional y el comportamiento del confinado durante su reclusión. Expuso que, si bien no se utilizó el criterio de "gravedad del delito", el Comité aplicó el criterio de "historial de violencia excesiva" fundamentándose en la extensión de la sentencia y los delitos imputados en la misma.

Así, el Tribunal de Apelaciones concluyó que "[u]tilizar el historial de violencia excesiva como único criterio para ratificar la custodia máxima nos parece un abuso de discreción, que incide sobre el mandato constitucional de rehabilitación". Ap. Sol. Cert., pág. 14. Finalmente sostuvo que el Departamento de Corrección no demostró cuál prueba sustancial utilizó para justificar la ratificación de custodia máxima. Por consiguiente, ordenó la reclasificación del confinado a un nivel de custodia mediana.

En desacuerdo, el Departamento de Corrección acudió ante este Tribunal por medio de la petición de certiorari. Señaló que el Tribunal de Apelaciones erró al determinar que el criterio discrecional de "historial de violencia excesiva" es una extensión de la sentencia o delitos imputados. Sostiene, además, que el foro recurrido erró al concluir que el Departamento de Corrección utilizó como único factor este criterio para ratificar el nivel de custodia del señor Lebrón Laureano a máxima.

Expedido el auto y con el beneficio de la comparecencia de ambas partes procedemos a resolver.

II

En primer lugar, debemos examinar si el Departamento de Corrección actuó correctamente al aplicar la modificación discrecional sobre "historial de violencia excesiva". Lo anterior conlleva determinar si el criterio discrecional de "historial de violencia excesiva" comprende las

características violentas del delito y, por tanto, si es extensible a la conducta del confinado fuera de la institución. Contestamos ambas interrogantes en la afirmativa.

La Constitución de Puerto Rico establece la política pública de "reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Art. VI, Sec. 19, Const. P.R., LPRA, Tomo 1, ed. 2016, pág. 455. El Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, Plan de Reorganización Núm. 2-2011, 3 LPRA Ap. XVIII (Plan de Reorganización), hace valer esta política pública. El Plan de Reorganización facultó al Departamento de Corrección con el poder de reglamentación para estructurar la política pública correccional y establecer las normas para el régimen institucional. Art. 5(c), Plan de Reorganización, 3 LPRA Ap. XVIII. Además, autorizó al Secretario del Departamento de Corrección a adoptar, establecer, desarrollar, enmendar, derogar e implementar reglas, reglamentos, órdenes, manuales, normas y procedimientos para el funcionamiento efectivo de los organismos bajo su jurisdicción. Esto tiene el propósito de regir la seguridad, la disciplina interna y la conducta de funcionarios, empleados y de la clientela, así como los programas y servicios. Art. 7(aa), Plan de Reorganización, 3 LPRA Ap. XVIII.

La clasificación de los confinados, función delegada al Departamento de Corrección, se rige por el Manual para Crear y Definir Funciones del Comité de Clasificación y Tratamiento en las Instituciones Correccionales, Manual Núm. 8523 de 26 de septiembre de 2014, (Manual Núm. 8523) y el Manual para la Clasificación de Confinados, Manual Núm. 8281 de 30 de noviembre de 2012, (Manual Núm. 8281), según enmendado por la Enmienda al Manual para la clasificación de Confinados, Reglamento Núm. 9033 de 18 de junio de 2018 (Reglamento Núm. 9033). Ambos delimitan la discreción de la agencia en los asuntos relacionados con la clasificación de custodia de los confinados.

La Regla 1 del Art. V del Manual Núm. 8523, supra, dispone que el Comité "tendrá la función básica de evaluar al confinado en términos de sus necesidades, capacidades, intereses, limitaciones y funcionamiento social y estructurarle un plan de tratamiento". Además, dispone que el Comité atenderá toda situación de un confinado sentenciado relacionada a su plan de tratamiento, lo que incluirá: estudiar su situación con el fin de identificar sus necesidades, capacidades, intereses y limitaciones, conocer su funcionamiento social, clasificarlo y trazarle un plan de tratamiento institucional. Esto incluye, entre otros: el tipo de custodia; alojamiento; trabajo; estudios o adiestramiento vocacional; tratamiento especializado por alguna condición especial, y otros programas o servicios. Regla 4 (A) del Art. V del Manual Núm. 8523, supra.

Por su parte, el Manual Núm. 8281, <u>supra</u>, adoptó criterios objetivos para interpretar y aplicar los datos concernientes a la clasificación funcional y adecuada de los confinados. En la Introducción del Manual Núm. 8281 se dispone que el proceso de clasificación responde al balance de intereses entre el nivel de custodia menos restrictivo posible para el confinado y la seguridad y necesidades de la sociedad, los demás confinados y del personal correccional. <u>Íd</u>. pág. 1. La evolución en cuanto al grado de supervisión en cada nivel responde a que la persona se acerque cada vez más a lo que sería un ciudadano en la libre comunidad. <u>López Borges v. Adm. Corrección</u>, 185 DPR 603, 613 (2012).

El Manual Núm. 8281 define la clasificación objetiva como un proceso confiable de clasificación inicial y reclasificación periódica mediante la que se reúne a los confinados y se les subdivide en grupos. Manual Núm. 8281, <u>supra</u>, pág. 5. La reclasificación se define como la "[r]evisión periódica de los confinados en lo que respecta a su progreso como parte del Plan Institucional, así como también a su nivel de custodia". <u>Íd</u>., pág. 12. Los miembros de la población correccional de custodia máxima recibirán su revisión de nivel de custodia cada seis meses, una vez hayan cumplido su primer año de sentencia bajo la clasificación de custodia máxima. <u>Íd</u>., pág. 24.

Ahora bien, el Art. IV, Sec. 7 (II), del Manual Núm. 8281 establece que la **reevaluación de custodia no necesariamente tiene como resultado un cambio en la**

**clasificación de custodia**. Íd., pág. 48. El objetivo es que se clasifique a los confinados con trasfondos parecidos a niveles de custodia similares. Íd., pág. 16. Este proceso de evaluación del nivel de custodia requiere que un Técnico Sociopenal llene el Formulario de Reclasificación de Custodia para confinados sentenciados, a saber: la Escala de Reclasificación. Apéndice K, Sec. 7 (III) (C) (6), Manual Núm. 8281, supra.

La Sección II del Apéndice K del Manual Núm. 8281, supra, establece los ocho criterios para evaluar el nivel de custodia. Estos son: la gravedad de cargos/sentencias actuales; el historial de delitos previos; el historial de fuga, o tentativas de fuga; el número de acciones disciplinarias; las acciones disciplinarias previas serias; las sentencias anteriores por delitos graves como adulto (de los últimos cinco años); la participación de programas/tratamiento, y la edad actual. Íd. Estos criterios se evalúan en la parte II (Evaluación de Custodia) de la Escala de Reclasificación.

No obstante, esa puntuación, por sí sola, no conlleva un cambio automático en la clasificación del nivel de custodia. Al contrario, la Escala de Reclasificación provee al Técnico Sociopenal algunos criterios adicionales — discrecionales y no discrecionales — para determinar el grado de custodia que finalmente recomendará para un confinado. Estos criterios son evaluados en la parte III de la Escala de Reclasificación. En esta parte III existen

varios renglones llamados modificaciones discrecionales que permiten aumentar el nivel de custodia. El Manual Núm. 8281, supra, define las modificaciones discrecionales como el "conjunto de factores específicos de clasificación que el personal puede usar para modificar la puntuación de clasificación de un confinado, pero solamente con la aprobación del supervisor de clasificación". Íd. pág. 8. Entre estos se encuentran: la gravedad del delito; el historial de violencia excesiva; la afiliación prominente con gangas; que el confinado es de difícil manejo; grados de reincidencia; el riesgo de fuga; el comportamiento sexual agresivo; trastornos mentales o desajustes emocionales; representar amenaza o peligro; la desobediencia ante las normas, y el reingreso por violación de normas. Instrucciones de la Escala de Reclasificación, Sec. III (D), Apéndice K, Manual Núm. 8281, supra.

Como vemos, la determinación del nivel de custodia proviene de un conjunto de criterios y no solo de la puntuación obtenida en la parte II de la Escala de Reclasificación. De este modo, la reclasificación responde al resultado de la parte II y parte III de la Escala de Reclasificación, es decir, al resultado de: (1) la puntuación en la evaluación de custodia, (2) las consideraciones especiales de manejo, (3) las modificaciones no discrecionales, (4) las modificaciones discrecionales para un nivel de custodia más alto, y (5) las modificaciones discrecionales para un nivel de custodia más bajo.

Ahora bien, toda modificación discrecional para aumentar el nivel de custodia debe estar basada en documentación escrita, proveniente de reportes disciplinarios, informes de querellas, informes de libros de novedades, **documentos del expediente criminal** o social, y cualquier otra información o documento que evidencie ajustes o comportamiento del confinado contrario a las normas y la seguridad institucional. Íd. Además, la Sección III (F) de las Instrucciones de la Escala de Reclasificación del Manual Núm. 8281, supra, dispone que deberá explicarse cuál de las modificaciones discrecionales aplica e incluir los detalles correspondientes.

Por otro lado, el Reglamento Núm. 9033, supra, enmendó la Sección 6, Artículo III, del Manual Núm. 8281, supra, para añadir la letra (D). Esta enmienda se debe en gran parte a los acuerdos en el caso del Tribunal Federal para el Distrito de Puerto Rico, Morales Feliciano et al. v. Estado Libre Asociado de Puerto Rico, Civil Num. 79-4 (PJB-LM). Allí, el perito del Estado sometió el informe *Commonwealth of Puerto Rico Administration of Corrections Implementation and Validation of the Inmate Classification System*. En cuanto al proceso de clasificación, determinó que se estaba clasificando a los confinados en los niveles de custodia apropiados, con excepción de los confinados de máxima custodia. Además, concluyó que el uso de las modificaciones discrecionales (*over-rides*) en las evaluaciones de confinados con sentencias de 99 años o más era excesivo.

Así, la enmienda al Manual Núm. 8281, supra, consistió en establecer que los confinados con sentencias de 99 años o más permanecerían en custodia máxima por cinco años, incluyendo el tiempo cumplido en preventiva. Sec. 6 (III)(D), Reglamento Núm. 9033. Luego de ese tiempo, serán evaluados y podrán ser reclasificados a un nivel de custodia mediana, **si de acuerdo con el resultado del instrumento de clasificación procede**. Íd. La enmienda añadió que no se podría recurrir al uso de la modificación discrecional de "gravedad del delito" ni al uso de los fundamentos de "extensión o largo de la sentencia" para mantener los confinados en custodia máxima. Íd.

Por otro lado, sabido es que el Departamento de Corrección merece particular deferencia en lo concerniente al proceso de clasificación de confinados. Cruz v. Administración, 164 DPR 341, 355 (2005). Cónsono con lo anterior, las determinaciones administrativas gozan de una presunción de legalidad y corrección ya que cuenta con la experiencia y pericia para realizar este tipo de evaluaciones. Super Asphalt v. AFI y otros, 2021 TSPR 45, 206 DPR __ (2021); Capó Cruz v. Jta. Planificación et al., 204 DPR 581 (2020). Como consecuencia, las determinaciones administrativas deben sostenerse por los tribunales siempre que no sean arbitrarias o caprichosas. Román Ortiz v. OGPe, 203 DPR 947, 956 (2020). Por eso, si una decisión de clasificación de custodia es razonable y cumple con el procedimiento de las reglas y manuales sin alterar los

términos de la sentencia impuesta, debemos confirmarla. Cruz v. Administración, supra, pág. 355.

Recordemos que el Comité, por lo general, está compuesto de "peritos en el campo tales como técnicos sociopenales y oficiales o consejeros correccionales". Íd., págs. 344-355. Así, "[e]stos profesionales cuentan con la capacidad, la preparación, el conocimiento y la experiencia necesarios para atender las necesidades de los confinados y realizar este tipo de evaluaciones". Íd., pág. 355.

III

A través del Plan de Reorganización la Asamblea Legislativa le dio amplio poder de reglamentación al Departamento de Corrección para administrar todo lo concerniente a la institución carcelaria. Eso incluye la clasificación de custodia de los confinados. En cuanto a este aspecto, de la reglamentación discutida se puede apreciar que el Comité y los profesionales que lo integran tienen amplia discreción para evaluar el progreso del confinado en aras de determinar el nivel de custodia aplicable. En lo pertinente a la controversia, la única limitación que se le impuso al Comité fue que, en los casos de confinados con sentencias de noventa y nueve años o más, no tomara en consideración la gravedad del delito ni los fundamentos de extensión o largo de la sentencia para evaluar la reclasificación.

En el caso ante nuestra consideración no se utilizó el criterio de "gravedad del delito" ni la "extensión o largo

de la sentencia" para ratificar el nivel de custodia máxima del señor Lebrón Laureano. En su lugar, el Comité utilizó el criterio discrecional de "historial de violencia excesiva" fundamentándose en las características violentas de los delitos por los cuales se halló culpable al señor Lebrón Laureano. Sin embargo, el señor Lebrón Laureano alega que, aunque no se utilizó el criterio de "gravedad del delito", los fundamentos utilizados fueron los correspondientes a este criterio y a la "extensión o largo de la sentencia". En suma, el señor Lebrón Laureano estuvo en desacuerdo en cuanto a la aplicación del criterio discrecional de "historial de violencia excesiva" para ratificar el nivel de custodia máxima. Sostuvo que dicha actuación constituyó un abuso de discreción.

El Tribunal de Apelaciones acogió el planteamiento del señor Lebrón Laureano. Además, determinó que el criterio de "historial de violencia excesiva" se circunscribe a la conducta institucional del confinado.

El foro recurrido erró al llegar a dicha conclusión. El concepto de "gravedad del delito" es distinto al concepto de "historial de violencia excesiva". Por tanto, responde a fundamentos distintos. Además, ese criterio no se circunscribe a la conducta del confinado en la institución de reclusión.

Desde mucho tiempo atrás sostuvimos que no existe ninguna clasificación entre delitos graves y menos graves que no sea la clasificación que hace el Código Penal. <u>Pueblo</u>

v. Tribunal de Distrito, 66 DPR 395, 403 (1946). El Artículo 16 del Código Penal de 2012, 33 LPRA sec. 5022, dispone que "[l]os delitos se clasifican en menos graves y graves".[1] Una mirada al Artículo 16 del Código Penal de 2012, supra, nos revela que los conceptos "delito menos grave y grave" están definidos según la pena que aparejan. Al respecto el Artículo 16 del Código Penal de 2012, supra, continúa exponiendo que:

> Es delito menos grave todo aquél que apareja pena de reclusión por un término que no exceda de seis (6) meses, pena de multa que no exceda de cinco mil (5,000) dólares o pena de restricción domiciliaria o de servicios comunitarios que no exceda de seis (6) meses. Delito grave comprende todos los demás delitos.

Por su parte, el Artículo 11 del Código Penal de 2012, 33 LPRA sec. 5011, dispone que uno de los objetivos generales de la imposición de una pena es "[e]l castigo justo al autor del delito en proporción a la gravedad del delito y a su responsabilidad".

En atención a lo anterior, la gravedad del delito responde a la pena que apareja el delito. En este sentido, Soto Nieves nos indica que "[p]ara medir la gravedad de las distintas especies delictivas *no hay otro patrón que el de las penas respectivamente asignadas*". (Énfasis en el original). (Citas omitidas). F. Soto Nieto, <u>Correlación entre acusación y sentencia: La tesis del artículo 733 de la</u>

---

[1] El Artículo 16 del Código Penal de 2012, supra, continúa exponiendo que:

> Es delito menos grave todo aquél que apareja pena de reclusión por un término que no exceda de seis (6) meses, pena de multa que no exceda de cinco mil (5,000) dólares o pena de restricción domiciliaria o de servicios comunitarios que no exceda de seis (6) meses. Delito grave comprende todos los demás delitos.

Ley de Enjuiciamiento Criminal, 1ra ed., Madrid, Ed. Montecorvo, 1979, pág. 94. La interpretación anterior sobre la gravedad del delito parece ser la correcta, pues, si se atendiera a las características del delito para determinar la gravedad de este llegaríamos a situaciones contrarias al sistema de determinación de penas. A modo ilustrativo, las siguientes expresiones con relación al antiguo delito de blasfemia del Código Penal español ilustran este razonamiento:

> La importancia de los delitos *se gradúa en función de la gravedad de las penas a imponer*, y no de otra manera distinta, ya que si, de acuerdo con la tesis recurrente, se hiciera depender del rango ideal correspondiente a los diversos bienes jurídicos penalmente tutelados por la Ley, se llegaría a la inaceptable conclusión de que legalmente sería más grave el delito de blasfemia, cometida en ofensa del Ser Supremo, o de la Divinidad, no obstante lo cual, aparece sancionado con la pena de arresto mayor, que el delito de parricidio, penado con la de reclusión mayor a muerte, conclusión que demuestra que no es éste el *criterio para hacer la oportuna comparación sobre la gravedad de los delitos, sino el de la sanción aplicable impuesta por el legislador a cada delito* . . . (Énfasis en el original). Íd.

Luego de esta interpretación del concepto de gravedad del delito, cobra sentido porqué la Sec. 6 (III) (D), Reglamento Núm. 9033, supra, menciona que "[n]o se podrá recurrir al uso de la Modificación Discrecional sobre la 'gravedad del delito' ni al uso de los fundamentos de 'extensión o largo de la sentencia' para [mantener al confinado con sentencia de 99 años o más] en custodia máxima". Nótese, que el Reglamento Núm. 9033, supra, relaciona el concepto de "gravedad del delito" con el

fundamento de la "extensión o largo de la sentencia". Eso es cónsono con que la gravedad del delito responda a la pena asignada y no al rango ideal del bien jurídico que se protege.

Ahora bien, el Comité puede aplicar discrecionalmente el criterio de "gravedad del delito" cuando "las circunstancias del delito y sus consecuencias crearon una situación de tensión en la comunidad, revistiéndose el caso de notoriedad pública y la comunidad se siente amenazada con su presencia". Instrucciones de la Escala de Reclasificación, Sec. III (D), Apéndice K, Manual Núm. 8281, supra.

Por tanto, en atención a lo anterior, puede surgir la siguiente duda, esta es, ¿si las circunstancias violentas del delito están comprendidas dentro del criterio discrecional de "gravedad del delito"? Contestamos esta interrogante en la negativa.

El criterio discrecional de "gravedad del delito" permite que el Comité tome en consideración cualquier circunstancia del delito que no esté completamente reflejada en su clasificación. No obstante, las circunstancias que se caracterizan como violentas corresponden al criterio discrecional de "historial de violencia excesiva".

El criterio de "historial de violencia excesiva" tiene el alcance de considerar el historial de actos violentos del confinado. Lo anterior surge de la propia definición cuando se refiere a un "historial documentado de conducta violenta,

como por ejemplo, asesinato, violación, agresión, intimidación con un arma o incendio intencional…”. Instrucciones de la Escala de Reclasificación, Sec. III (D), Apéndice K, Manual Núm. 8281, supra. Esto también se refleja cuando se indica que el criterio discrecional de violencia excesiva “[s]e refiere a confinados cuyo historial de funcionamiento social o delictivo revele agresividad o que constantemente sus acciones manifiesten conducta violenta”. Íd. Por ende, de las representaciones anteriores de lo que significa el criterio discrecional de “historial de violencia excesiva” podemos concluir que este comprende las circunstancias violentas del delito.

Por consiguiente, el criterio de “historial de violencia excesiva” corresponde a fundamentos distintos a los aplicables al criterio de “gravedad del delito”. Esto es, que el primero se centra en las características violentas del delito, independientemente de su clasificación.

En este caso, la Técnico Sociopenal que llenó el Formulario de Reclasificación de Custodia fundamentó la aplicación del criterio discrecional de “historial de violencia excesiva” en las características violentas que rodearon el delito por el cual se halló culpable al señor Lebrón Laureano. En este sentido, la Técnico Sociopenal indicó que el peticionario incurrió en “[d]elitos violentos causando la muerte a dos sere[s] humanos, haciendo uso de un arma [de] fuego”. Ap. Sol. Cert., pág. 80. Por su parte, el

Comité esbozó el siguiente fundamento para ratificar el nivel de custodia máxima:

> En el caso que nos ocupa cumple una sentencia de 233 años por delitos de naturaleza extrema. Ha dejado extinguido 7 años, 9 meses y 1 día. El mínimo de su sentencia es para el 13 de octubre de 2090... Durante su confinamiento ha mantenido ajustes negativos que lo ha [sic] llevado a salir incurso en querella disciplinaria, **posee historial delictivo por delitos contra el ser humano**. No se ha beneficiado de tratamiento enfocado al manejo de Conducta Antisocial. Por lo que requiere mantenerlo en un nivel de custodia de máximas restricciones físicas y controles externos. (Énfasis nuestro). Ap. Sol. Cert., pág. 74.

Por otra parte, en sus determinaciones de hechos, el Comité expresó que del "expediente [del señor Lebrón Laureano] se desprende que cuenta con antecedentes penales por infracción [(sic)]Tentativa de Asesinato (10 años), extinguió la sentencia en Bayamón 1072 para el 1999 al 2005". Ap. Sol. Cert., pág. 82.

De los fundamentos de la Técnico Sociopenal, como del Comité, se puede apreciar que ambos utilizaron como fundamento las circunstancias violentas del delito por el cual fue sentenciado, y no la gravedad del delito. Dichos fundamentos están relacionados con el criterio discrecional de "historial de violencia excesiva", pues, este incluye el "historial de conducta violenta, como por ejemplo, asesinato, violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación del historial de violencia". Instrucciones de la Escala de Reclasificación, Sec. III (D), Apéndice K, Manual 8281, supra. Por consiguiente, el foro recurrido erró

al concluir que los fundamentos esbozados por el Departamento de Corrección corresponden al criterio discrecional de "gravedad del delito" y el fundamento de "extensión o largo de la sentencia", y no al criterio de "historial de violencia excesiva", que es distinto al criterio de "gravedad del delito".

Además, resulta inmeritorio señalar que no se puede tomar en cuenta su historial delictivo, por tentativa de asesinato, porque ya cumplió esa sentencia. Del propio Manual Núm. 8281 surge que al hacer una recomendación para la reclasificación de custodia el personal debe estudiar "los datos básicos relacionados con la clasificación incluyendo: delitos y sentencias actuales, **historial delictivo anterior y encarcelamientos previos bajo el Departamento de Corrección y Rehabilitación**, fecha prevista de excarcelación, historial disciplinario y de participación en programas de tratamiento". Sec. 7 (III) (5) (b), Manual Núm. 8281, supra. Este dato cobra vigencia porque el señor Lebrón Laureano fue sentenciado por un delito cuya intención fue atentar contra la vida de un ser humano.

IV

Como adelantamos, el criterio discrecional de historial de violencia excesiva no se circunscribe a la conducta del confinado en la institución. Esta conclusión se puede extrapolar de la propia definición de este criterio. El Manual Núm. 8281 lo define de la siguiente manera:

El confinado tiene un historial documentado de conducta violenta, como por ejemplo, asesinato,

violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación del historial de violencia. Esta conducta **puede** haber ocurrido hace más de cinco años mientras el confinado estuvo encarcelado o mientras estaba asignado a un programa comunitario.

Se refiere a confinados cuyo historial de funcionamiento social o delictivo revele agresividad o que constantemente sus acciones manifiesten conducta violenta. Esta **podrá** demostrarse a través de ataques físicos o tentativa de ataques a otros confinados, a oficiales de custodia, a empleados o a cualquier otra persona, acompañados estos en ocasiones por el uso de armas, vocabulario provocador o insultante o destrucción de la propiedad. (Énfasis suplido). Íd.

**La definición del criterio brinda espacio para aplicar el criterio a confinados que poseen un historial documentado de conducta violenta y a confinados con un historial de funcionamiento social o delictivo que revelan agresividad o que constantemente sus acciones manifiestan una conducta violenta. Es decir, el criterio incluye pero no se limita a conducta dentro de la institución.** Si bien la primera oración de la definición ata el criterio a las circunstancias del delito cometido, esta permite, además, que se tome en cuenta conducta violenta durante el confinamiento, independientemente del tiempo en que ocurrió. Así, el criterio discrecional de "historial de violencia excesiva" no está atado de forma infalible a las circunstancias del delito o a los incidentes acaecidos antes o durante el confinamiento. Surge de la propia definición que se refiere al historial de funcionamiento social **o delictivo** que revele

agresividad, o de acciones que constantemente manifiestan conducta violenta. Íd.

**En ese sentido, el Manual Núm. 8281, supra, no prohíbe que la agencia evalúe el funcionamiento social del confinado dentro de la institución, así como las circunstancias que rodean el delito cometido, como son: agresividad, conducta violenta, desprecio por la vida humana, entre otras.** Por eso, no es contrario a nuestro esquema penal que el Departamento de Corrección tome en consideración el delito por el cual un confinado está cumpliendo la sentencia actual. Se hace esto en aras de determinar la **forma en que se va a cumplir** la pena impuesta. Véase, S. Mir Puig, Derecho Penal: Parte general, 10ma ed. rev., Barcelona, Ed. Reppertor, pág. 777.

Por consiguiente, el Comité no erró al aplicar el criterio discrecional de "historial de violencia excesiva" para valorar las características violentas del delito por el cual fue hallado culpable. Dicha actuación no es contraria al reglamento. Ahora bien, nos resta por determinar si el Comité utilizó un solo factor de la condena al momento de reclasificar al confinado.

V

En ocasiones anteriores hemos rechazado que la buena conducta exhibida por un confinado y su participación en programas de rehabilitación y trabajo sean los únicos factores para determinar si procede un cambio en el nivel de custodia. Cruz v. Administración, supra, pág. 351. Así,

rechazamos que solo se descanse en un solo factor en la determinación de la clasificación de custodia de un confinado.

En este caso una Técnico Sociopenal completó la Escala de Reclasificación de acuerdo con las Instrucciones de la Escala de Reclasificación, Sec. III (D), Apéndice K, Manual 8281, supra. En el caso del señor Lebrón Laureano, este obtuvo una puntuación de cinco en los renglones de los criterios objetivos. Si utilizáramos ese número aisladamente, el señor Lebrón Laureano sería acreedor a una custodia mínima. Ahora bien, como mencionamos, la reevaluación de custodia no necesariamente tiene como resultado un cambio en la clasificación de custodia o la vivienda asignada. Consecuentemente, la puntuación obtenida en la parte II de la Escala de Reclasificación, por sí sola, no conlleva un cambio automático en la clasificación del nivel de custodia. En su lugar, la evaluación de todos los factores que provee el Manual Núm. 8281 requiere que se tomen en consideración otros aspectos, como lo son las modificaciones discrecionales. En atención a lo anterior, la Técnico Sociopenal aplicó la modificación discrecional sobre "historial de violencia excesiva". Esa actuación, como ya discutimos, no constituyó un abuso de discreción.

Por consiguiente, el Comité tomó en consideración todos los factores que enumera el Manual Núm. 8281, supra, para la Escala de Reclasificación. No estamos ante una situación en la cual "[s]e descartaron los demás elementos que se evalúan

en la reclasificación, que responden al proceso de rehabilitación del recluso". López Borges v. Adm. Corrección, supra, págs. 612. Por otro lado, resulta pertinente resaltar que en López Borges v. Adm. Corrección, supra, el Departamento de Corrección descartó lo reglamentado en el Manual de Clasificación de Confinados del 2000. En su lugar, fundamentó su determinación de mantener al confinado en custodia máxima exclusivamente en la aplicación del Artículo 62 del Código Penal de 1974.[2] Íd., págs. 613-614. En el caso que ahora nos ocupa, a diferencia de los hechos en López Borges v. Adm. Corrección, supra, el Departamento de Corrección no descartó lo reglamentado en el Manual Núm. 8281, supra, para amparar su determinación en un único factor exógeno a su esquema reglamentario. Al contrario, se condujo de acuerdo con lo dispuesto en el Manual Núm. 8281, supra, para la evaluación del confinado a través de la Escala de Reclasificación.

Por lo tanto, sostenemos que la actuación de la agencia en este caso constituye una decisión razonable, que cumple

---

[2] El Artículo 62 del Código Penal de 1974 disponía que:

> En caso de reincidencia habitual el convicto será declarado por el Tribunal delincuente habitual y será sentenciado a separación permanente de la sociedad mediante reclusión perpetua. No obstante lo dispuesto en la Ley Núm. 116 de 22 de julio de 1974, según enmendada, [4 LPRA secs. 1101 et seq.] en cuanto a la facultad de la Administración de Corrección para determinar las instituciones en que habrá de ser ingresada o trasladada la clientela del sistema correccional, el convicto que sea sentenciado a separación permanente cumplirá todo el término de reclusión en una institución especializada de máxima custodia y la Administración de Corrección proveerá a este tipo de delincuente todos los servicios y programas en la propia institución, incluyendo aquellos que propendan a su rehabilitación. 33 LPRA ant. sec. 3302.

cabalmente con el procedimiento de la reglamentación citada. Conforme a esta reglamentación, la agencia tiene la discreción de analizar caso a caso el conglomerado de criterios que tiene a su haber para evaluar el nivel de custodia en el cual debe estar cada confinado, en ánimo de salvaguardar no solo su efectiva rehabilitación, sino además, la seguridad institucional y de la población confinada.

VI

Por los fundamentos antes expuestos, se revoca la Sentencia del Tribunal de Apelaciones que revocó la Resolución del Departamento de Corrección y Rehabilitación. En consecuencia, se ratifica el nivel de custodia máxima del señor Lebrón Laureano.

Se dictará Sentencia de conformidad.


                                    RAFAEL L. MARTÍNEZ TORRES
                                          Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis E. Lebrón Laureano

    Recurrido

       v.                         CC-2020-0641

Departamento de Corrección
y Rehabilitación

    Peticionario

SENTENCIA

En San Juan, Puerto Rico, a 27 de mayo de 2022.

Por los fundamentos antes expuestos, en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se revoca la Sentencia del Tribunal de Apelaciones que revocó la Resolución del Departamento de Corrección y Rehabilitación. En consecuencia, se ratifica el nivel de custodia máxima del señor Lebrón Laureano.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. Los Jueces Asociados señor Estrella Martínez y señor Colón Pérez emitieron Opiniones disidentes. La Jueza Presidenta Oronoz Rodríguez no interviene.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| Luis E. Lebrón Laureano | | |
|---|---|---|
| Recurrido | | |
| v. | CC-2020-0641 | Certiorari |
| Departamento de Corrección y Rehabilitación | | |
| Peticionario | | |

Opinión disidente emitida por el Juez Asociado Señor ESTRELLA MARTÍNEZ.

En San Juan, Puerto Rico, a 27 de mayo de 2022.

Una vez más, nos encontramos ante un despliegue flagrante de arbitrariedad y abuso de discreción por parte del Departamento de Corrección y Rehabilitación (Corrección) en la evaluación del desarrollo institucional de un confinado. Tal despliegue quebranta de forma incuestionable su mandato de fomentar la rehabilitación de los miembros de la población correccional.

Pese a esto, la Opinión que hoy respalda una mayoría de este Tribunal valida la manipulación caprichosa y altamente prejuiciada de los mecanismos de reevaluación de custodia con el fin de retener a un confinado en un nivel de reclusión que en nada abona a su progreso. Esto, aun cuando tal estrategia se fundamenta en argumentos forzados e

inconexos con la realidad que representa el expediente institucional. Y es que, en lugar de afirmar el criterio que orientó nuestra decisión en López Borges v. Adm. Corrección, infra, donde rechazamos el abuso del proceso de reevaluación del nivel de custodia, hoy retrocedemos en el camino recorrido en detrimento de la rehabilitación de la comunidad confinada.

A mi juicio, igual a como lo identificamos en el uso de la modificación discrecional de la gravedad del delito, el historial de violencia excesiva también está predispuesto a ser explotado en las reevaluaciones del nivel de custodia de los confinados. Lo que es peor, su uso desmesurado se fundamenta en visiones subjetivas de las circunstancias del delito y está prácticamente desvinculado del historial institucional del confinado. Al conferirle su anuencia a esta táctica, este Tribunal suma un eslabón más a la cadena que restringe y sofoca la misión constitucional rehabilitadora que debe prevalecer en nuestro sistema correccional.

Por tal razón, disiento de la validación y extensión hoy reconocida a tal modificación discrecional. A continuación, expongo las razones que orientan mi postura, no sin antes repasar el contexto fáctico de la controversia.

I

Por hechos ocurridos en el 2011, el Sr. Luis E. Lebrón Laureano (señor Lebrón Laureano) cumple una sentencia de 233 años de reclusión y actualmente está clasificado en un nivel de custodia máxima. Como parte de la evaluación periódica

del nivel de custodia que efectúa Corrección, el 21 de noviembre de 2019, el Comité de Clasificación y Tratamiento emitió unos Acuerdos. En estos, ratificó el nivel de custodia máxima para el señor Lebrón Laureano mediante la activación del criterio discrecional de "historial de violencia excesiva", a pesar de que este obtuvo una puntuación en la escala objetiva correspondiente a un nivel de custodia menor.

En consecuencia, el señor Lebrón Laureano presentó una apelación en la cual objetó la falta de objetividad en su evaluación y la inobservancia a sus ajustes institucionales positivos. Destacó que solo ha sido objeto de un informe disciplinario que data del 2014, por lo que es demasiado remoto para constituir un factor en la evaluación. Sostuvo que el uso del criterio discrecional se fundamentó en un delito cuya pena ya extinguió y en los delitos por los cuales actualmente está encarcelado. Por lo anterior, razonó que los criterios que sustentaron su retención en el nivel de custodia máxima representan un doble castigo, además de ser ilegales por dirigirse a la gravedad del delito y la extensión de la sentencia.

En respuesta, Corrección denegó la apelación. De entrada, rechazó que el uso del criterio discrecional se fundamentara en la gravedad del delito o en la extensión de la sentencia. Sostuvo que era permisible considerar el historial delictivo previo y, aunque reconoció que el señor Lebrón Laureano no cuenta con querellas recientes, afirmó que este posee un historial disciplinario. Indicó que, aunque

ha tomado algunas terapias, el señor Lebrón Laureano debía beneficiarse de las terapias dirigidas específicamente a la modificación de la conducta delictiva. Disconforme, el señor Lebrón Laureano solicitó la reconsideración, pero Corrección la denegó.

Insatisfecho, el señor Lebrón Laureano acudió ante el Tribunal de Apelaciones a través de un escrito que intituló <u>Moción en solicitud de reclasificación de custodia</u>. Arguyó que Corrección basó su determinación únicamente en aspectos del delito y obvió los ajustes positivos que ha exhibido durante su confinamiento. Señaló que ya se había beneficiado de todos los programas disponibles que le eran requeridos en su plan institucional y que la razón por la que no había completado otros es porque la propia agencia no los había provisto. Indicó, además, que completó sus cursos educativos, se desempeñó con excelencia en sus labores de cocina y que el único informe disciplinario en su contra es remoto.

Por su parte, Corrección expresó que utilizó la modificación discrecional de historial de violencia excesiva debido a que el señor Lebrón Laureano causó la muerte de dos (2) personas con un arma de fuego y cuenta con antecedentes violentos. Sostuvo que el análisis de la modificación discrecional no se limita a los incidentes ocurridos durante el confinamiento, sino que también puede incluir aquellos que tuvieron lugar antes de la reclusión. No obstante, argumentó que el señor Lebrón Laureano también había incurrido en faltas en sus ajustes institucionales. A esto

añadió que este no se había beneficiado de ciertos tratamientos y terapias. Razonó que no medió arbitrariedad en su determinación, por lo que había que concederle deferencia a su criterio.

El 25 de septiembre de 2020, el Tribunal de Apelaciones emitió una Sentencia. De entrada, el foro apelativo intermedio destacó que el historial institucional del señor Lebrón Laureano reflejaba solo una querella disciplinaria remota, por lo que, en conjunto con la puntuación que obtuvo en la evaluación objetiva, quedó demostrado su comportamiento y ajuste adecuado dentro de la institución. Razonó que la evaluación de reclasificación debía fundamentarse en el comportamiento del confinado durante su reclusión para una rehabilitación efectiva, por lo que, al enfocarse en la naturaleza del crimen, Corrección actuó de forma arbitraria e irracional. Por consiguiente, ordenó la reclasificación del señor Lebrón Laureano a un nivel de custodia mediana.

En desacuerdo, Corrección presentó una Moción de reconsideración. Negó que la modificación discrecional de historial de violencia excesiva se limitara al comportamiento del confinado dentro de la institución penal. Expuso que tal criterio depende de un análisis abarcador que incluye los ajustes, la sentencia, los delitos y la participación en programas y tratamientos. Señaló que el historial de violencia excesiva del señor Lebrón Laureano se desprendía de las circunstancias del delito y del hecho de que había sido encarcelado previamente por una tentativa de asesinato.

Alegó que el señor Lebrón Laureano demostró ser incapaz de cumplir con las normas de su confinamiento, exhibió una falta de controles y posee un historial de violencia, por lo que colocarlo en un nivel de custodia mediana podía poner en peligro la seguridad de la institución. No obstante, el Tribunal de Apelaciones la declaró no ha lugar.

Todavía inconforme, Corrección presentó una Petición de certiorari ante este Tribunal en la cual reiteró que el historial de violencia excesiva no se circunscribe a la conducta durante el confinamiento. Destacó una vez más que los delitos por los cuales el señor Lebrón Laureano resultó convicto habían sido violentos y alegó que este no reconocía su culpabilidad. A esto añadió que sus ajustes institucionales negativos, la falta de ciertas terapias y su convicción previa demostraban que el señor Lebrón Laureano no comprendió las consecuencias de la conducta delictiva. Razonó que ello ilustró que la modificación discrecional no fue el único factor que se tomó en cuenta para ratificar el nivel de custodia máxima.

Posteriormente, el señor Lebrón Laureano presentó, por derecho propio, una Moción en solicitud de reclasificación de custodia. En síntesis, afirmó que procedía confirmar la determinación del Tribunal de Apelaciones, pues la decisión de Corrección se basó en fundamentos erróneos e interpretaciones subjetivas de su historial delictivo e institucional. Señaló, además, que Corrección todavía se

negaba a reclasificarlo de nivel de custodia a pesar de lo ordenado por el foro apelativo intermedio.

El 26 de marzo de 2021, este Tribunal expidió el recurso de _certiorari_. Con posterioridad, una mayoría de los miembros de este Foro respaldó la _Opinión_ que es objeto de mi disenso. En esta, se aceptó como válida la consideración de las circunstancias del delito para el uso de la modificación discrecional del historial de violencia excesiva y se afirmó su aplicación en este caso. Ello, a pesar de que es evidente que Corrección fundamentó la retención del señor Lebrón Laureano en el nivel de custodia máxima en factores que, en primer término, obran en contra de su rehabilitación y, en segundo término, se limitan a circunstancias que nunca cambiarán o dependen de la acción de la propia agencia administrativa.

Expuestas así las circunstancias fácticas que enmarcan esta controversia, procedo a discutir el Derecho que sustenta mi postura.

## II

Es esencial recalcar en casos de esta naturaleza que la Sec. 19 del Art. VI de la Constitución de Puerto Rico define con claridad que "[s]erá política pública del Estado Libre Asociado reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social". Art. VI, Sec. 19, Const. PR, LPRA, Tomo 1,

ed. 2016, pág. 455. Es decir, la misión rehabilitadora de nuestro sistema correccional es un mandato de rango constitucional.

Como el fin de materializar este cometido, la Asamblea Legislativa promulgó el Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, Plan 2-2011 de 21 de noviembre de 2011 (Plan de Reorganización), 3 LPRA Ap. XVIII, el cual estableció como objetivo principal el implantar un procedimiento que facilitara la imposición de custodias, así como también la instauración de programas de rehabilitación moral y social con el propósito de fomentar la reincorporación de los confinados a la sociedad. Tal aspiración se canaliza mediante la "[c]lasificación adecuada y revisión continua de la clientela, conforme a los ajustes y cambios de ésta". Íd., Art. 5(a).

En específico, el Plan de Reorganización dispone que:

> [l]a población correccional será sometida a evaluaciones periódicas con el propósito de conocer y analizar su situación social, física, emocional y mental, historial delictivo e identificar sus capacidades, intereses, motivaciones, controles y limitaciones, a los fines de clasificarlos y determinar el plan de acción a tomar en cada caso, en armonía con los principios de tratamiento individualizado y seguridad pública enmarcados en los propósitos de este Plan. Íd., Art. 10.

En lo pertinente al contexto particular de este caso, tales evaluaciones deben efectuarse cada seis (6) meses a los componentes de la población de custodia máxima. Íd., Art. 10(b). Esto, pues, mientras más restrictivo es el nivel de custodia, con mayor frecuencia este debe reevaluarse para

analizar si la **conducta** del confinado merece una reducción en el nivel de custodia. <u>López Borges v. Adm. Corrección</u>, 185 DPR 603, 609 (2012). **La importancia de tal reducción, como parte del proceso de rehabilitación, yace en el imperativo de ubicar a cada confinado en el nivel de custodia menos restrictivo posible**. Íd., pág. 608.

Para facilitar tal encomienda se creó el <u>Manual para la Clasificación de Confinados</u>, Reglamento Núm. 8281 de 30 de noviembre de 2012 (Manual de Clasificación). Es importante destacar que el Manual de Clasificación reconoce y reafirma que el proceso de clasificación de custodia **tiene que ubicar al confinado en el programa y nivel de custodia menos restrictivo posible**.[1]

Si bien el procedimiento para reevaluar la clasificación de custodia no necesariamente desemboca en una reclasificación a un nivel más bajo, la función primordial del ejercicio "es verificar la **adaptación del Confinado** y prestarle atención a cualquier situación que pueda surgir".[2] Es debido a tal enfoque en la adaptación institucional del confinado que, en su Sec. 7, el Manual de Clasificación indica que el proceso de reclasificación "se parece a la evaluación inicial de custodia, **pero recalca aún más en la**

---

[1]Véase, Manual para la Clasificación, Perspectiva General, Introducción, pág. 1; Exposición de Políticas, inciso 1, pág. 2; Clasificación: Responsabilidades, Objetivos y Principios Básicos, Sec. 2(II)(A)(2), pág. 16.

[2](Negrillas suplidas). Íd., pág. 48.

**conducta institucional como reflejo del comportamiento real del confinado durante su reclusión".[3]**

No puede ser de otra forma, pues, **"si sólo se evaluara la conducta por la que está presa la persona o se le diera mayor importancia a las características de su sentencia, no tendría sentido alguno la revisión periódica del nivel de custodia, pues el resultado del análisis siempre sería el mismo"**. (Negrillas suplidas). <u>López Borges v. Adm. Corrección</u>, supra, págs. 609-610. Por tal razón, **"[n]o sólo se le da más peso a la conducta que ha observado el recluso durante el confinamiento, sino que, incluso, no se considera la mala conducta dentro de la prisión que se haya dado mucho tiempo atrás"**. (Negrillas suplidas). Íd., pág. 609.

En fin, conforme dispone la propia Sec. 7, **"[e]s importante que los confinados que cumplan sentencias prolongadas tengan la oportunidad de obtener una reducción en niveles de custodia mediante el cumplimiento con los requisitos de la institución"**.[4] Esto, pues, al fin y al cabo, **"la reducción de custodia es un elemento esencial en el proceso de rehabilitación"**. (Negrillas suplidas). <u>López Borges v. Adm. Corrección</u>, supra, pág. 615.

De conformidad con estos objetivos, este Tribunal ha puntualizado que:

> [l]a determinación administrativa relativa al nivel de custodia asignado a un confinado

---

[3](Negrillas suplidas). Íd., Objetivos de la Reclasificación de Custodia, Sec. 7(II), pág. 48.

[4](Negrillas suplidas). Íd.

requiere que se realice un **balance de intereses adecuado**. Por una parte, estará el **interés público de lograr la rehabilitación del confinado, así como mantener la seguridad institucional y general del resto de la población penal; de la otra, estará el interés particular del confinado de permanecer en un determinado nivel de custodia**. Además, al momento de determinarse la procedencia de un cambio en el nivel de custodia, deberá considerarse una serie de factores subjetivos y objetivos, para cuya atención se requiere la pericia de la Administración de Corrección. (Negrillas suplidas). <u>Cruz v. Administración</u>, 164 DPR 341, 352 (2005).

Con ese fin en mente, la reevaluación de custodia de los confinados requiere el uso del <u>Formulario de Reclasificación de Custodia</u> (Formulario),[5] mediante el cual se asignan puntuaciones tanto a factores objetivos como subjetivos. Es a base de la puntuación total de tal Formulario que Corrección entonces recomienda un nivel máximo, mediano o mínimo de custodia.

Según se desprende del Manual para la Clasificación, los criterios objetivos a evaluarse son: (1) la gravedad de los cargos o sentencias actuales; (2) el historial de delitos graves previos; (3) el historial de fuga; (4) el número de acciones disciplinarias; (5) previas acciones disciplinarias serias; (6) sentencias anteriores por delitos graves; (7) la participación en programas, y (8) la edad.

Por otra parte, la evaluación también considera las llamadas modificaciones no discrecionales y discrecionales, las cuales permiten asignar un nivel de custodia más alto o

---

[5]Íd., Apéndice K.

bajo al que resulta de la tabulación de los criterios objetivos. Su activación tiene que fundamentarse en "documentación escrita, proveniente de reportes disciplinarios, informes de querellas, informes del libro de novedades, documento del expediente criminal o social y cualquier otra información o documentos que **evidencia ajustes o comportamiento del confinado contrario a las normas y seguridad institucional**".[6]

En lo pertinente a este caso, entre las modificaciones discrecionales se encuentra el "historial de violencia excesiva", el cual el Manual para la Clasificación define como sigue:

> El confinado tiene un historial documentado de conducta violenta, como por ejemplo, asesinato, violación, agresión, intimidación con un arma o incendio intencional que no están totalmente reflejadas en la puntuación del historial de violencia. Esta conducta puede haber ocurrido hace más de cinco años mientras el confinado estuvo encarcelado o mientras estaba asignado a un programa comunitario.

> Se refiere a confinados **cuyo historial de funcionamiento social o delictivo revele agresividad o que constantemente sus acciones manifiesten conducta violenta**. Esta podrá demostrarse a través de ataques físicos o tentativa de ataques a otros confinados, a oficiales de custodia, a empleados o a cualquier otra persona, acompañados estos en ocasiones por el uso de armas, vocabulario provocador o insultante o destrucción de la propiedad.[7]

---

[6] (Negrillas suplidas). Íd., Apéndice K, Sec. III(D).

[7] (Negrillas suplidas). Íd.

En las instancias en las que este Tribunal ha evaluado el uso de modificaciones discrecionales de esta naturaleza, hemos sido contundentes en que "**tomar en consideración únicamente un factor de la condena al momento de reclasificar al confinado, por ejemplo, la extensión de la sentencia, constituye un claro abuso de discreción por parte de Corrección**". (Negrillas suplidas). <u>López Borges v. Adm. Corrección</u>, supra, pág. 611.

A consecuencia de ello, se enmendó el Manual para la Clasificación mediante el Reglamento Núm. 9033 de 18 de junio de 2018, con el propósito de establecer que:

> Confinados con sentencias de 99 años o más y clasificados inicialmente en custodia máxima como resultado de la sentencia, permanecerán en dicha custodia por cinco (5) años incluyendo el tiempo cumplido en preventiva. Luego de ese periodo de tiempo, serán evaluados. Estos podrán ser reclasificados al nivel de custodia mediana si, de acuerdo al resultado del instrumento de clasificación, procede. **No se podrá recurrir al uso de la Modificación Discrecional sobre la "gravedad del delito" ni al uso de los fundamentos de "extensión o largo de la sentencia" para mantenerlos en custodia máxima.**[8]

En fin, tanto los lineamientos reglamentarios como los jurisprudenciales demuestran que el proceso de reevaluación del nivel de custodia es una herramienta en la rehabilitación del confinado y no un castigo por su delito. Además, apuntan a que este debe fundamentarse principalmente en la conducta

---

[8] (Negrillas suplidas). Véase, Sec. 2, Art. V (D) del Manual de Clasificación.

institucional del miembro de la población correccional y no en los delitos por los cuales cumple una condena.

Expuesto de esta forma el andamiaje legal aplicable, procede evaluar los hechos a la luz del Derecho que rige la controversia.

**III**

En su petición ante este Tribunal, Corrección sostiene que el Tribunal de Apelaciones descartó el criterio administrativo experto para ordenar una reducción en el nivel de custodia que no encuentra fundamento en el expediente y que puede poner en riesgo la seguridad de la institución penal. Afirma que la evaluación requiere que se tome en consideración la conducta delictiva por la cual el confinado fue sentenciado en conjunto con otros factores relacionados con su comportamiento dentro de la institución penal. Niega que considerara la extensión de la sentencia o que solo fundamentara su decisión en el historial de violencia excesiva y reitera que su determinación se basó en otros criterios. Expone que el señor Lebrón Laureano no ha demostrado que está capacitado para ser acreedor de un nivel menor de custodia.

Por su parte, en su Escrito en presentación de argumentos, el señor Lebrón Laureano destaca que se ha beneficiado de todos los programas y terapias que están disponibles en el nivel de custodia máxima, como también de cursos educativos y labores de cocina, ambos con evaluaciones excelentes. Reafirma que el único informe disciplinario en su contra se emitió en el 2014, por lo que no tiene un historial

institucional de conducta negativa reciente. Sostiene que la determinación de Corrección es subjetiva y que se desprende de su expediente que el nivel de custodia máxima no tiene alguna otra cosa que ofrecerle. Razona que retenerlo en este nivel no abona a su rehabilitación. **Le asiste la razón.**

Según revela la Escala de reclasificación de custodia en el Formulario, el señor Lebrón Laureano obtuvo una puntuación de cinco (5) en la evaluación objetiva, la cual corresponde a un nivel de clasificación de custodia mínima. La puntuación se subdivide en un seis (6) correspondiente a "extrema" en el primer renglón, el cual mide la "Gravedad de los cargos/Sentencias actuales", y un negativo uno (-1) en el octavo renglón dedicado a la edad por tener entre 25 a 39 años. **Nótese que el señor Lebrón Laureano obtuvo ceros (0) en los renglones dedicados al historial de delitos graves previos, el historial de fuga o tentativas de fuga, el número de acciones disciplinarias, acciones disciplinarias serias, sentencias anteriores por delitos graves y la participación en programas/tratamientos desde la última clasificación.** Mas, en la parte del análisis subjetivo, Corrección marcó el inciso correspondiente al historial de violencia excesiva dentro del renglón de "Modificaciones discrecionales para un nivel de custodia más alto".[9]

Corrección afirma que el uso de tal modificación discrecional no representó un abuso de discreción, pues

---

[9]Apéndice de la Petición de certiorari, págs. 79-80.

encuentra apoyo en diversos factores del historial del señor Lebrón Laureano. A su vez, niega que la gravedad del delito o la extensión de la sentencia que pesa en contra de este fueran factores en la activación de tal criterio. Basta con revisitar la documentación producida por Corrección durante el trámite administrativo para confirmar que su defensa dista de la realidad.

Para empezar, es importante destacar el fundamento que Corrección consignó en el encasillado designado en el Formulario para explicar el uso de la modificación discrecional, a saber: **"Delitos violentos causando la muerte a dos sere[s] humanos, haciendo uso de un arma de fuego. Cuenta con [a]ntecedentes violentos"**.[10]

Como se puede ver, la razón inmediata que proveyó la agencia administrativa para descartar la recomendación objetiva y activar la modificación discrecional estuvo relacionada exclusivamente con las circunstancias del delito y los antecedentes del señor Lebrón Laureano.

Mas, en los <u>Acuerdos</u>, Corrección expandió su explicación para añadir algunas razones adicionales:

> En el caso que nos ocupa **cumple una sentencia de 233 años por delitos de naturaleza extrema. Ha dejado extinguido 7 años, 9 meses y 1 día. El mínimo de su sentencia es para el 13 de octubre de 2090 y prevee que deje extingue la totalidad de la misma para el 13 de junio de 2236.** Durante su confinamiento ha mantenido **ajustes negativos que lo ha llevado a salir incurso en querella disciplinaria, posee historial delictivo por delitos contra el ser humano. No se ha beneficiado de tratamiento**

---

[10] (Negrillas suplidas). Íd., pág. 80.

> **enfocado al manejo de Conducta Antisocial.** Por lo que requiere mantenerlo en un nivel de custodia de máximas restricciones físicas y controles externos. 2. Ubicación actual. 3. Para completar el cuarto año de escolaridad. 4. No hay vacantes disponibles. 5. Con el propósito de que sea integrado a las terapias de Control de Impulso. 6. A petición del confinado ya que present[ó] evidencia, su progenitora presenta problemas de salud y se le hace difícil el trayecto para llegar a la institución.[11]

Según se puede apreciar, se desprende de las propias justificaciones esbozadas por Corrección que la ratificación del nivel de custodia máxima se debió a que el señor Lebrón Laureano: (1) extingue una pena de 233 años; (2) tiene ajustes institucionales negativos; (3) tiene un historial delictivo, y (4) necesita recibir tratamiento enfocado en el manejo de conductas antisociales. Es decir, (1) la extensión de la sentencia; (2) una sola querella que data del 2014; (3) un delito previo cuya pena ya extinguió, y (4) la falta de terapias que le corresponde a Corrección proveer.

De plano, la consideración del primer factor es inaceptable en nuestro ordenamiento, así establecido por este Tribunal y el propio reglamento de Corrección. Si bien la agencia niega consistentemente que considerara la longevidad de la sentencia como uno de los factores "abarcadores" que permite el uso del criterio discrecional de historial de violencia excesiva, salta a la vista que, en todas y cada una de las entradas en el proceso de evaluación y de sus comparecencias a lo largo de este trámite judicial, Corrección

---

[11](Negrillas suplidas). Íd., pág. 74.

nunca falló en mencionar y enfatizar la extensión de la sentencia de reclusión que pesa en contra del señor Lebrón Laureano.

De igual forma, Corrección ha hecho referencia sistemáticamente a un historial de ajustes negativos en el ámbito disciplinario del señor Lebrón Laureano. De hecho, en su recurso ante este Tribunal, Corrección arguye que el señor Lebrón Laureano ha demostrado ajustes negativos durante su confinamiento que lo han llevado a incurrir en "violaciones disciplinarias".[12]

No obstante, del propio expediente surge solo una (1) querella disciplinaria (Querella Nivel I), emitida el 29 de enero de 2014 y relacionada con la posesión de un teléfono celular, por la cual el señor Lebrón Laureano fue sancionado con la suspensión de visitas por (2) meses.[13] Por cierto, en sus Determinaciones de Hechos en los Acuerdos, Corrección indica que "[d]urante el periodo evaluado no ha sido incurso en Querella ni en informes de Indisciplina (sic.)".[14]

Entiéndase, no solo no hay indicio de algún otro incidente disciplinario, sino que Corrección, a pesar de siempre mencionar tal historial en plural, tampoco hace el esfuerzo de enumerar o describir la multiplicidad de ajustes negativos que supuestamente plagan el historial institucional

---

[12]Petición de certiorari, pág. 20.

[13]Apéndice de la Petición de certiorari, pág. 83.

[14]Íd., pág. 82.

del señor Lebrón Laureano al punto que hacen su presencia en un nivel más bajo de custodia un peligro para la seguridad de la institución penal. Lo que es más, Corrección acepta que este único incidente es remoto y no puede ser considerado para propósitos de la Escala objetiva. Sin embargo, en su afán de justificar su proceder arbitrario, arguye que nada le impide darle peso en el aspecto subjetivo de la evaluación, a pesar de que ni siquiera se trata de una infracción violenta.

La justificación para el uso de este factor se torna más inverosímil aún al considerar que los ajustes institucionales que sí se desprenden del expediente son abrumadoramente positivos. Conforme argumenta el señor Lebrón Laureano, y así lo confirma Corrección, este: (1) tomó cursos educativos hasta alcanzar su duodécimo grado de escolaridad, a pesar de que solo ostentaba un tercer grado al comenzar su pena de reclusión; (2) se desempeñó en labores de cocina con evaluaciones excelentes y solo fue removido de estas por razón de traslado a otra institución carcelaria, y (3) tomó todos los programas y terapias que están disponibles en el nivel de custodia máxima. Es decir, no hay evidencia alguna que fortalezca la aserción de que el señor Lebrón Laureano tiene ajustes negativos que hagan necesaria su retención en el nivel de custodia máxima porque representa un peligro para la seguridad institucional. Cualquier alegación a esos fines es, en el mejor de los casos para Corrección, especulativa, pero en realidad, exagerada.

Esto nos lleva a otro de los factores que pesaron en la decisión de Corrección: que el señor Lebrón Laureano no se ha beneficiado de ciertos tratamientos, terapias y programas. En específico, Corrección sostiene que, a pesar de haber sido referido para tal trámite, este aún no ha sido evaluado por el Negociado de Rehabilitación y Tratamiento (NRT). Asimismo, indica que es necesario que este se beneficie de tratamientos enfocados en la conducta antisocial mediante las terapias "Aprendiendo a Vivir sin Violencia" y "Control de Impulsos".

Al respecto, no puede perderse de vista que tales deficiencias en el proceso de rehabilitación del señor Lebrón Laureano se deben única y exclusivamente a Corrección. Nótese que, conforme establecen los propios Acuerdos, el señor Lebrón Laureano fue referido al NRT el **15 de noviembre de 2012**, mas al 21 de noviembre de 2019, este todavía no había sido evaluado.[15] No facilitar su acceso a las terapias que la propia agencia tilda de imperativas, como también fallar en darle continuidad a las evaluaciones a las que asignó tanto peso desde hace ya una década, son conductas atribuibles únicamente a Corrección. Por ende, ello no debería poder usarse en contra del señor Lebrón Laureano para retenerlo en un nivel de custodia que ya ha demostrado que no propicia su desarrollo y rehabilitación. Ello se agrava al considerar que, por admisión de Corrección, **tan siquiera hay cupo** para el señor Lebrón Laureano en la administración de tales terapias.

---

[15] Íd., pág. 83.

La arbitrariedad desplegada por Corrección irradia tanto de los argumentos circulares e inverosímiles antes mencionados como también de la decisión deliberada de hacer caso omiso a los ajustes positivos del señor Lebrón Laureano. La ausencia cabal de razonabilidad y objetividad se magnifica al examinar la razón para el último factor: el historial delictivo.

Una explicación más reveladora para la consideración de tal factor se desprende de la contestación de Corrección a la apelación del señor Lebrón Laureano, la cual, en lo pertinente, indica lo siguiente:

> Resulta de la convicción de sus casos actuales, que cumple por Asesinato en Primer Grado (2 casos), utilizando un arma de fuego, lo que evidencia su gran menosprecio por la vida de dos seres humanos, ciertamente poniendo de manifiesto el alto grado de violencia y la peligrosidad de los que participaron. Si analizamos su historial delictivo encontramos, que cumplió 10 años de sentencia por Tentativa de Asesinato, **lo que indica que no aprendió de la experiencia pasada y que el tiempo que estuvo separado de la sociedad cumpliendo en prisión, no le desalentó de la conducta antisocial.**[16]

Es de interés particular que la Escala objetiva cuenta con un renglón que permite considerar el historial de delitos graves previos, enfocándose en la severidad de uno con hasta diez (10) años de antigüedad, y las sentencias anteriores por delitos graves hasta con cinco (5) años de antigüedad. En el caso del señor Lebrón Laureano, este extinguió la pena por la

---

[16] (Negrillas suplidas). Íd., pág. 91.

tentativa de asesinato entre el 1999 al 2005,[17] por lo que tal delito era demasiado remoto al momento de la reevaluación del nivel de custodia y tuvo que otorgársele un cero (0) en tales renglones.[18] No obstante, igual que con el renglón de acciones disciplinarias, en el que Corrección también se vio obligado a otorgar un cero (0) en la Escala por tratarse de una acción disciplinaria demasiado remota, la agencia magnificó el peso de ambos factores en la evaluación subjetiva a pesar de que la objetiva lo consideró irrelevante al punto de la inexistencia a través de un cero (0).

Mas, es también especialmente inquietante que los miembros del Comité de Clasificación y Tratamiento afirmen la permanencia en custodia máxima del señor Lebrón Laureano bajo la percepción completamente subjetiva y prejuiciada de que este no aprendió de su reclusión previa y, por tanto, merece permanecer en ese nivel de custodia.[19] Sin mencionar que, a pesar de su inclinación recurrente a enfatizar el alto nivel de violencia y particular peligrosidad en los actos del señor

---

[17]Íd., pág. 75.

[18]Íd., pág. 79.

[19]Tal argumentación raya en la línea clara que estableció este Tribunal en López Borges v. Adm. Corrección, supra, en lo que respecta al uso del argumento de la reincidencia habitual para obstruir la reclasificación de un confinado a un nivel menos restrictivo de custodia. Esto, pues, el enfoque particular que Corrección impone en la previa convicción del señor Lebrón Laureano y la conexión con los delitos por los que cumple su condena actual, en combinación con su aserción de que no aprendió de su reclusión anterior, pareciera asimilarse a un argumento de reincidencia habitual.

Lebrón Laureano, ni el expediente ni las propias determinaciones de hecho que fundamentaron la retención en el nivel máximo de custodia describen la naturaleza particularmente extrema y de violencia excesiva de estos crímenes. De hecho, aun tomando como cierta la naturaleza que Corrección le ha atribuido a la conducta del señor Lebrón Laureano para justificar el uso de la modificación discrecional, esta dista de los requerimientos de la propia definición de historial de violencia excesiva, la cual exige la manifestación de una conducta violenta y agresiva "constante" en contra de otros confinados, funcionarios o empleados de Corrección.

Por si fuera poco, en otra entrada más en la lista de argumentos por parte de Corrección que no encuentran anclaje en el expediente, la agencia administrativa hace la aserción en más de una ocasión de que el señor Lebrón Laureano "no acepta haber cometido el delito, y no ha hecho una introspección adecuada de los hechos que lo condujeron a su confinamiento".[20] Por el contrario, lo que sí se desprende del expediente es una nota en la propia reevaluación del nivel de custodia que claramente establece que el señor Lebrón Laureano "aceptan (sic.) la comisión de los delitos".[21]

En fin, el resultado inescapable de esta evaluación es que, descartados los argumentos de Corrección por ser

_____

[20]Petición de certiorari presentada por Corrección, pág. 22.

[21]Apéndice de Petición de certiorari, pág. 76.

inaceptables (la extensión de la sentencia), no estar fundamentados en el expediente según requiere el reglamento o ser demasiado remotos (violaciones disciplinarias), y por ser atribuibles únicamente a la propia agencia (falta de terapias y evaluaciones), en el mejor de los casos para Corrección, estamos ante solo un factor como justificación para mantener al señor Lebrón Laureano en el nivel de custodia máxima: el historial delictivo. Esto, conforme repasamos anteriormente, representa un abuso de discreción claro y manifiesto por parte de la agencia administrativa. De nuevo, no solamente es impermisible que se use un solo factor discrecional para ratificar un nivel de custodia máximo, sino que está claramente establecido que el enfoque principal de la evaluación del nivel de custodia es la conducta del confinado dentro de la institución, no su historial delictivo.

Por otra parte, contrario a lo que expresa Corrección y erróneamente acoge este Tribunal, la instrucción en el Manual de Clasificación en la Sec. 7(III)(C)(5)(b), no constituye una autorización irrestricta para que los datos básicos del confinamiento tengan más peso en la reevaluación que cualquier desarrollo institucional. Es decir, la instrucción de "verificar y estudiar los datos relacionados", entre estos, los delitos y sentencias actuales, el historial delictivo anterior y encarcelamientos previos, puede permitir que estos factores se tomen en consideración, pero de ninguna manera puede interpretarse que su valor se magnifica al extremo que determinan, como ocurrió en este caso, la procedencia de un

nivel más alto de custodia aun ante un expediente de conducta institucional positivo.

**El efecto ineludible de esta práctica es, por supuesto, que se perpetúe la desestimación de los resultados objetivos a favor de la apreciación prejuiciada y subjetiva de las circunstancias del delito por el cual el confinado ya cumple una pena.** Es decir, que, contrario al mandato expreso al enfoque en el desarrollo institucional del confinado que demuestra su rehabilitación, se ha recurrido al uso de tecnicismos para darle más peso a la apreciación personal de los delitos por parte de los funcionarios de Corrección que evalúan las reclasificaciones de custodia.

A pesar de cuán diáfanos son el despotismo y la insensatez que emanan de esta práctica por parte de Corrección, la Opinión mayoritaria valida esta conducta mediante un enfoque en las distinciones semánticas entre las modificaciones discrecionales de la gravedad del delito y el historial de violencia excesiva. De esta forma, se le concede una carta blanca a Corrección para que continúe confiriéndole más valor subjetivo a las circunstancias del delito y otros factores que están descontextualizados de la conducta institucional del confinado. Su consecuencia directa e inmediata no es solo el ignorar que, en este caso, Corrección, en efecto, tomó en consideración la severidad de la pena de reclusión y descartó casi en su totalidad la conducta institucional del señor Lebrón Laureano, sino que la conclusión de la agencia todavía redunda en el uso de un solo

criterio inaceptable para la retención del señor Lebrón Laureano en el nivel de custodia máxima.

Es decir, aun si se toma como bueno que el historial de violencia excesiva permite la consideración y su fundamentación entera en las circunstancias del delito y la conducta fuera del confinamiento, perdura una tendencia intolerable por parte de Corrección a descartar los imperativos de sus propios reglamentos y la jurisprudencia de este Tribunal dirigidos a darle preeminencia al desarrollo institucional del confinado. Bajo la Opinión que hoy avala una mayoría de este Tribunal, en lugar de viabilizar su rehabilitación, se castiga al miembro de la población correccional de forma ilimitada por circunstancias que nunca van a cambiar, meramente basado en cuán vil le parezcan tales circunstancias al funcionario de la agencia administrativa que le corresponda evaluar su nivel de custodia.

Ante una manifestación tan clara de abuso de discreción e irracionalidad, este Tribunal estaba obligado a prescindir de toda deferencia y a reivindicar la protección de los derechos que han sido atropellados mediante las actuaciones de Corrección. Al este Tribunal conferir su aprobación a tal contravención de los postulados más básicos de nuestro sistema correccional y su propósito constitucional, no me queda más que disentir.

**IV**

Consecuentemente, me he rehusado a patrocinar un historial de indiferencia a las protecciones

constitucionales de la ciudadanía. El Acceso a la Justicia y el reconocimiento de derechos a grupos marginados, en no pocas ocasiones, es contrario a los intereses del Estado e incluso al deseo de los sectores mayoritarios de la sociedad. Precisamente, son el Poder Judicial y la Constitución las herramientas esenciales en un sistema democrático para evitar que grupos minoritarios, que no gozan del favor del público y de los administradores, logren un reconocimiento pleno de sus protecciones constitucionales. Sin embargo, hoy desde el disenso lamento que no se pueda alcanzar esa aspiración esencial para maximizar el Derecho de Acceso a la Justicia cuando la deferencia excesiva al gobierno conduce a una indiferencia a las protecciones constitucionales.

Por los fundamentos antes expresados, disiento del proceder mayoritario. En cambio, hubiera confirmado la sentencia del Tribunal de Apelaciones y ordenado la reclasificación del señor Lebrón Laureano al nivel de custodia mediana.

Luis F. Estrella Martínez
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Luis E. Lebrón Laureano

    Recurrido

      v.                 CC-2020-0641

Departamento de Corrección
Y Rehabilitación

    Peticionario

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 27 de mayo de 2022.

Como es sabido, el Artículo VI, Sección 19 de la Constitución del Estado Libre Asociado de Puerto Rico, Const. ELA Art. VI, Sec. 19, LPRA, Tomo 1., establece que será política pública del Estado **"reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social"**. (Énfasis suplido). Sí, en nuestra jurisdicción, aunque muchos y muchas renieguen dicha obligación, es responsabilidad del gobierno, dentro de su condición presupuestaria, el tratamiento adecuado a las personas convictas de delito para hacer realidad su rehabilitación moral y social.

Cónsono con el referido mandato constitucional, y en lo relacionado a la controversia que nos ocupa, la Asamblea Legislativa de Puerto Rico aprobó el Plan de Reorganización del Departamento de Corrección y Rehabilitación de 2011, 3 LPRA Ap. XVIII. Por virtud de este estatuto, se consolidaron varias agencias adscritas al Poder Ejecutivo y se decretó como política pública del Estado: "la creación de un sistema integrado de seguridad y administración correccional donde las funciones y deberes se armonicen en un proceso facilitador a la imposición de penas y medidas de seguridad, así como a la custodia de los ciudadanos que han sido encontrados incursos en la comisión de un delito o falta y que establezcan procesos de rehabilitación moral y social del miembro de la población correccional o transgresor, a fin de fomentar su reincorporación a la sociedad". *Íd*., Art. 2. En otras palabras, dicho Plan, *supra*, continuó con el objetivo principal de implementar un proceso que facilitara la imposición de custodias y el establecimiento de programas de rehabilitación moral y social con el fin último de fomentar la reincorporación de las personas confinadas a la sociedad. *Íd*. Véase, también, *Ibarra González v. Depto. Corrección*, 194 DPR 29, 42 (2015) (Estrella Martínez, voto particular disidente).

En esa dirección, y como medida para fomentar la rehabilitación de las personas recluidas en nuestras instituciones carcelarias, el Departamento de Corrección y Rehabilitación adoptó el *Manual para la Clasificación de*

*Confinados*, Reglamento Núm. 8281 de 30 de noviembre de 2012 (en adelante, "Manual Núm. 8281"), según enmendado por la *Enmienda al Manual para la Clasificación de Confinados*, Reglamento Núm. 9033 de 18 de junio de 2018. Ambos documentos, -- los dos de aplicación al caso de autos --, instituyen el procedimiento para la clasificación y reclasificación de las personas confinadas.

**Al respecto, es menester señalar que, si bien la reclasificación de custodia es similar a la evaluación inicial, el enfoque de la primera radica aún más en evaluar la conducta institucional que refleja el comportamiento real de la persona confinada durante su reclusión**. Manual Núm. 8281, Sec. 7. Véase, también, *López Borges v. Adm. Corrección*, 185 DPR 603, 609 (2012). Esto es así debido a que no tendría sentido alguno la revisión periódica del nivel de custodia de un confinado o confinada si solo se evaluara la conducta por la cual éste o ésta resultó recluida en una institución penal o se brindara mayor importancia a las características de la sentencia pues, queda claro que el resultado siempre sería el mismo. *Ibarra González v. Depto. Corrección*, *supra*, pág. 43 (Estrella Martínez, voto particular disidente); *López Borges v. Adm. Corrección*, *supra*, págs. 609-610.

Así pues, para lograr los antes dichos propósitos, conviene señalar aquí que el Departamento de Corrección y Rehabilitación utiliza lo que se conoce como el *Formulario de Reclasificación de Custodia*, el cual se incluye como uno

de los apéndices del mencionado Manual Núm. 8281, *supra*, junto al documento titulado *Instrucciones para Formulario de Reclasificación de Custodia*. El aludido formulario está organizado en varias secciones, a saber: I. Identificación; II. Evaluación de custodia; III. Resumen de la escala y recomendaciones; IV. Revisión por parte del Comité de Clasificación y Tratamiento del nivel de custodia recomendado y asignación a la población; V. Asignación de vivienda del confinado, y VI. Certificación.

En lo aquí pertinente, la Sección III, intitulada Resumen de la escala y recomendaciones, contiene determinados renglones adicionales, entre ellos, las llamadas modificaciones no discrecionales, las modificaciones discrecionales para un nivel de custodia más bajo y las modificaciones discrecionales para un nivel de custodia más alto. Estas últimas deben estar apoyadas en documentación escrita que evidencie algún ajuste o comportamiento del confinado o la confinada contrario a las normas y seguridad institucional. Manual Núm. 8281, Apéndice K, Sec. III(D).

Establecido lo anterior, es necesario destacar que, hace exactamente un año atrás, al tratar una controversia muy similar a la que hoy nos ocupa, en *Ortiz Pérez v. Depto. Corrección*, 207 DPR 67 (2021) (Colón Pérez, voto particular disidente), -- donde evaluábamos uno de los criterios de modificación no discrecional al que se hace referencia en el mencionado *Formulario de Reclasificación de Custodia*, a saber, faltarle más de quince (15) años para ser considerado

por la Junta de Libertad bajo Palabra -- expresamos que el factor bajo estudio era, a todas luces, inconstitucional por ser contrario al mandato prescrito en la Constitución del Estado Libre Asociado de Puerto Rico de hacer posible la rehabilitación moral y social de la persona privada de libertad. Sostuvimos que, en escenarios como los que allí se trataban,[1] dicho mandato no podía cumplirse. Lo anterior, toda vez que la modificación no discrecional de referencia inhabilitaba a las personas confinadas que cumpliesen condenas extensas a beneficiarse de los privilegios que conllevaba la reclasificación de custodia. Añadimos que esto era así porque el criterio en cuestión suprimía cualquier otra consideración y, en consecuencia, provocaba un estado de inmutabilidad en el progreso de la persona confinada.

En el presente litigio, -- uno en el cual firmemente reafirmamos todo lo dicho en nuestro disenso en *Ortiz Pérez v. Depto. Corrección*, *supra*, -- no podemos llegar a una conclusión distinta. Y es que, estamos ante otro caso más donde el Departamento de Corrección y Rehabilitación, **en lo que ya parece ser su preocupante *modus operandi*,** -- finalizada la suma de puntos concedidos en el *Formulario de Reclasificación de Custodia*, suma que hacía merecedor al Sr. Luis E. Lebrón Laureano a un nivel de custodia mínima --

---

[1] En el referido caso, el Departamento de Corrección y Rehabilitación denegó la reclasificación de custodia a una persona confinada que reflejó una puntuación objetiva de dos (2) equivalente a custodia mínima tras aplicársele la modificación no discrecional por faltarle más de quince (15) años para ser considerada por la Junta de Libertad bajo Palabra.

deniega conceder tal beneficio a este último al utilizar como único factor uno de los llamados criterios de modificación, en específico, la modificación discrecional de historial de violencia excesiva.

**Modificación discrecional que, en lo que a la causa de epígrafe se refiere, estuvo fundamentada en los tipos de delitos por los cuales en su día fue juzgado el señor Lebrón Laureano.** Dato que, como cuestión de hecho, con el paso del tiempo nunca cambiará y que, al parecer, -- por la conducta continuamente desplegada por parte de los funcionarios y funcionarias del Departamento de Corrección y Rehabilitación -- mantendrán a las personas confinadas, como el señor Lebrón Laureano, en una custodia máxima perpetua. Son muchos los casos como éstos. **¿Dónde queda entonces el mandato constitucional a concentrar nuestros esfuerzos en la rehabilitación moral y social de las personas confinadas con el fin último de reincorporarlas a la sociedad civil?**

La contestación a esa interrogante -- por la cantidad de estudios políticos, sociales y económicos que se merecen realizar -- no la tenemos del todo clara; lo que sí tenemos en extremo claro en estos momentos es que nos encontramos ante una agencia de gobierno con dos apellidos (Corrección y Rehabilitación) que, por lo visto y pasado el tiempo, ha decidido renunciar al último de ellos. Flaco servicio el que, con dicho proceder, se le hace a la población penal -- la cual también tiene derechos, aunque algunos y algunas los

pongan en tela de juicio -- y, con ello, a todo nuestro Pueblo.


                                        Ángel Colón Pérez
                                          Juez Asociado